[Sac. No. 1677.    In Bank.—November 22, 1909.]

EMMA MULLAN LUKENS et al., Respondents, v. A. B.
NYE, Controller of the State of California, Appellant.

GOVERNOR OF STATE—EXERCISE OF LEGISLATIVE FUNCTION IN APPROVAL
OF BILLS—EXTENT OF POWERS.—The governor of the state, while
engaged in considering bills which have passed both houses of the
legislature and which are presented to him for approval or dis-
approval, acts in a legislative capacity and not as an executive.
He is for that purpose a part of the legislative department of the
state. As an executive officer, he is forbidden to exercise any legis-
lative power or function except as in the constitution provided, and
his powers, as a part of the legislative department, are specifically
enumerated in the constitution.

ID.—LIMITED POWERS OF GOVERNOR—EXERCISE IN CONTRAVENTION OF
POWERS.—When exercising the powers of approving or disapprov-
ing bills, conferred by section 16 of article IV, of the constitution,
the governor is a special agent with limited powers, and can act
only in the specified mode and can exercise only the granted powers.
If he attempts to exercise them in a different mode, or to exercise
powers not given, his act will be wholly ineffectual and void for
any and every purpose.

ID.—APPROVAL BY GOVERNOR—MODIFICATION OF LAW.—Except in the
single instance of a bill containing several items of appropriation
of money, when he may approve one or more of them and object to
the others, the governor is not empowered to modify or change
the effect of a proposed law, or to do anything concerning it except
to approve or disapprove it as a whole. If he approves it, his
duty requires him to sign it as evidence of such approval.

ID.—APPROVAL MUST BE OF ENTIRE BILL—QUALIFIED APPROVAL.—With
the exception stated, the approval by the governor must be of the
bill as a whole and without qualification. Any attempt on his part
to attach to his approval any qualification, or to withhold his con-
sent to a part of the law and give it to other parts, will either
be entirely nugatory and ineffectual and leave the approval absolute,
or it will completely nullify the approval and operate as a veto of
the whole bill.

ID.—AGREEMENT WITH BENEFICIARY TO EXCEPT PART OF APPROPRIATION.
—The governor cannot qualify or change a law by any agreement
or contract on behalf of the state, made at the time of his approval,
with persons who are to be benefited by the law, whereby they
agree to release to the state a part of such benefit. His signature,
once attached to the bill, is the exclusive and conclusive evidence of
his unqualified approval, and no evidence, nor the judgment of any
court, can be allowed to modify or change the terms or effect of

the law, or prevent or impair its complete operative force.  This rule is as applicable to a law appropriating money to satisfy the claim of a private individual as to any other law.

ID.—INVALIDITY OF AGREEMENT—PROOF OF AGREEMENT INADMISSIBLE.— An agreement between the governor and the beneficiaries under an act appropriating money to satisfy a claim against the state, to the effect that the controller of the state should draw his warrants for a smaller sum than that appropriated in satisfaction of the whole amount, is futile and void for any purpose; and in a proceeding by the beneficiaries to enforce the payment of the full amount so appropriated, such an agreement cannot be proved.  It is immaterial whether such agreement was in writing or in parol.

ID.—AGREEMENT AGAINST PUBLIC POLICY—BENEFICIARIES NOT ESTOPPED.—Such an agreement is wholly void, and against public policy, and cannot operate as an estoppel against the beneficiaries of the act from claiming the whole of the amount appropriated, and evidence thereof is inadmissible as proving the basis of such estoppel.

ID.—LEGISLATIVE MOTIVES CANNOT BE CONSIDERED.—The motives which impelled the legislature, or any component part or member of it, to enact a law, cannot be made a subject of judicial inquiry for the purpose of invalidating or preventing the full operation of the law.

ID.—MANDAMUS LIES TO ENFORCE APPROPRIATION.—Notwithstanding the making of such an agreement between the governor and the beneficiaries under the act, a writ of mandate will lie at the instance of such beneficiaries to enforce the payment of the entire sum appropriated by the act.

APPEAL from a judgment of the Superior Court of Sacramento County.  Peter J. Shields, Judge.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, and Malcolm C. Glenn, Deputy Attorney-General, for Appellant.

G. Russell Lukens, A. A. De Ligne, and Hiram W. Johnson, for Respondents.

SHAW, J.—This is an action in *mandamus* to compel the controller to issue a warrant on the state treasurer to the plaintiffs for the sum of $22,808.15, being the second installment of the amount appropriated to John Mullan by the act of the legislature approved March 22, 1905 (Stats. 1905, p.

791), in satisfaction of his claim against the state. The plaintiffs are his assignees.

The act appropriates $45,616.30, in payment of said claim, and declares that "the controller is hereby authorized and directed to draw his warrant for the said sum and the treasurer of state is hereby authorized and directed to pay the same, and thereupon the said John Mullan shall make and deliver unto the controller a full receipt and release of his said claim." One half is made payable on January 1, 1906, and one half on January 1, 1907. The installment due on January 1, 1906, has been paid. This action is to compel a warrant for the remaining one half. The act exempts the claim from the provisions of section 672 of the Political Code and therefore it is not required to have the sanction of the board of examiners.

The answer of the controller alleges the following facts in defense. Prior to the passage of the act the claim had been assigned to the plaintiffs. After the bill had been passed in both houses of the legislature and before its approval, the governor informed the plaintiffs that the amount allowed by the bill was excessive and that he would not approve the same unless the plaintiffs would agree to accept the sum of twenty-five thousand dollars in full satisfaction of the claim. Thereupon plaintiffs and the governor agreed that twenty-five thousand dollars was the full amount of the claim. An agreement was drawn up providing that in consideration of the sum of twenty-five thousand dollars, to be paid in two installments, the first of $22,808.15, to be paid January 1, 1906, and the second of $2,191.85, to be paid on January 1, 1907, the said plaintiffs acknowledged full receipt and satisfaction of the claim and released the state from further liability, claim, and demand therefor, and that if the payments were not made on said dates, the agreement should be void. For the purpose of inducing the governor to approve said bill and attach his signature thereto so that it would become a law, plaintiffs signed the said agreement and delivered it to the governor for the benefit of the state, and the governor, relying upon the said agreement, and being thereby induced to do so, signed the said bill, whereby it became a law. The plaintiffs, in pursuance of said agreement, on January 2, 1906, demanded of the controller a warrant for the sum of $22,808.15, due on

that day by the act, and thereupon the controller, for the purpose of carrying out said agreement, and relying thereon and also on the representations of the plaintiffs that they would accept the sum of twenty-five thousand dollars in full satisfaction of said claim, issued and delivered the said warrant, so demanded, and the plaintiffs collected the same from the treasury. The controller is ready and willing to issue a warrant for the remainder of $2,191.85, due under the agreement, and has offered the same to the plaintiffs, who refuse to accept it.

A demurrer was sustained to the answer, and judgment passed to the plaintiffs as prayed for. The appellant contends: 1. That the agreement is valid; 2. That the plaintiffs, after thereby inducing the governor to sign the appropriation bill in question, are estopped to demand any greater sum than the agreement provides; and 3. That under the rules applying in *mandamus* the lower court, in the exercise of a sound discretion, should have refused the writ on the ground that the claim for the excess is unjust and inequitable.

The governor was without power to take or receive the agreement in question and he could not make it a valid contract. While engaged in considering bills which have passed both houses of the legislature and which are presented to him for approval or disapproval, he is acting in a legislative capacity and not as an executive. He is for that purpose a part of the legislative department of the state. (*Fowler* v. *Peirce,* 2 Cal. 172; *People* v. *Bowen,* 21 N. Y. 521.) As an executive officer, he is forbidden to exercise any legislative power or function except as in the constitution expressly provided. (Art. III.) His powers, as a part of the legislative department, are specifically enumerated in the constitution. When such a bill is presented, "if he approves it, he shall sign it; but if not, he shall return it, with his objections, to the house in which it originated." If, while the legislature is in session, he neglects to return or sign a bill for ten days, Sundays excepted, it becomes a law without his signature. If the legislature adjourns within the ten days it does not become a law unless, within the designated time after such adjournment, he shall sign and deposit the same in the office of the secretary of state. (Const., art. IV, sec. 16.) When exercising these powers he is a special agent with limited powers, and as in

the case of other special agents, he can act only in the specified mode and can exercise only the granted powers. If he attempts to exercise them in a different mode, or to exercise powers not given, his act will be wholly ineffectual and void for any and every purpose. When he goes beyond the limits of these powers in the attempt to exercise them, his acts, so far as they transcend the powers, are of no force. In Ohio, the senate alone attempted to empower a committee to investigate the city officers of Cincinnati, a matter not germane to the powers or business of the senate. Holding the committee an illegal body the court said: "Whatever inherent power the general assembly in its entirety may possess by virtue of its being the repository of the whole legislative power of the state, we do not think it follows as a conclusion that one of its constituent parts must likewise possess the same inherent powers. It may be conceded that either branch of the legislature has all such powers as are necessarily implied in the express grant of powers to it by the constitution; but under the system of distribution of powers in the American constitutions, and especially under the constitution of Ohio, which is explicit in excluding from the legislative department the exercise of any power which is not delegated in the constitution (art. I, sec. 20), the authority of a single branch of the legislature to act separately must be found in express terms or by necessary implication in the constitution. It is clear that the 'legislative power,' whatever may be the extent of that power which is conferred upon the general assembly, is not expressly delegated to a part of the general assembly. Nor is it impliedly so delegated. The constitution explicitly grants and defines the separate powers of each branch of the general assembly. . . . The powers of each house are not general and subject only to limitation in the constitution, as is the legislative power of the entire general assembly; but they are specific or enumerated powers. . . . We therefore must look to the enumerated powers alone to determine this question; and it were just as sane to claim that either branch of the legislature might, by itself, enact a law, as to claim that by 'inherent power' it could independently exercise any legislative power outside of those specifically designated in the constitution." (*State* v. *Guilbert,* 75 Ohio St. 43, [78 N. E. 934].)

The same principles apply when the power of the governor as a legislative instrumentality is involved. He may act only in the prescribed mode, and may exercise only the powers enumerated, or necessarily implied. In the case of a bill containing several items of appropriation of money, he may approve one or more of them, and object to the others. (Art. IV, sec. 16.) In no other case is he empowered to modify or change the effect of a proposed law, or to do anything concerning it except to approve or disapprove it as a whole. He cannot participate in the discussions or proceedings of either house, except by sending them a veto message when a bill is disapproved. If he approves a proposed bill, his duty requires him to sign it as evidence of such approval. This approval, except in the single instance stated, must be of the bill as a whole, and without qualification. Any attempt on his part to attach to his approval any qualification, or to withhold his consent to a part of the law and give it to other parts, will either be entirely nugatory and ineffectual, and leave the approval absolute, or it will completely nullify the approval and operate as a veto of the whole bill. (*Porter* v. *Hughes*, 4 Ariz. 1, [32 Pac. 165] ; *State* v. *Holder,* 76 Miss. 158, [23 South. 643].)

His approval makes such a bill a part of the statute law, next to the constitution, the highest manifestation of the will of the people. The governor cannot qualify or change it by any contemporaneous agreement or contract on behalf of the state with persons who are to be benefited by the law, whereby they agree to release to the state a part of such benefit. That would be to permit the governor and the persons concerned to make the law to suit themselves without the concurrence of the legislative houses. His signature, when it is shown to have been attached, is the exclusive and conclusive evidence of his unqualified approval, and the result being law, no evidence, nor the judgment of any court, can be allowed to modify or change its terms or effect, or prevent or impair its complete operative force. The constitution makes no distinction between a law appropriating money to satisfy the claim of a private individual and a law declaring the will of the people on any other subject. Its mandate is unalterably fixed by the words of the bill, made a law by the final act of the governor, and it is unchangeable except by the power which

enacted it. "It is a principle in the English law, that an act of Parliament, delivered in clear and intelligible terms, cannot be questioned, or its authority controlled, in any court of justice." (1 Kent's Com. 447.) And in the United States, "if there be no constitutional objection to a statute, it is with us as absolute and uncontrollable as laws flowing from the sovereign power in any other form of government. (1 Kent's Com. 448.)

This law is binding upon all the executive officers of the state. It expressly commands the controller to draw warrants on the treasurer for the sum appropriated. The Political Code also a binding law, directs him to do the same. (Sec. 433, subd. 17; sec. 672.) These commands of the law are not to be questioned by any official or citizen, or controlled by the courts. Any agreement between the governor and the beneficiaries to the effect that the controller shall draw his warrants for a smaller sum in satisfaction of the whole amount, must necessarily be futile and entirely void for any purpose. The facts alleged could not be proven as the foundation upon which to prevent the operation of the law, or to qualify its terms in any respect, and they are, in law, irrelevant and immaterial.

The scheme of legislation provided in the constitution does not contemplate nor countenance such proceedings by the governor, as a mode of qualifying or affecting the operation of a law. If it were permitted the governor would practically have power to adjust claims against the state, a power not given to him by any law and which the constitution plainly vests exclusively in the legislature. (Art. IV, secs. 22, 29, 30, 31, 32, 34.) The appropriation bills enacted into law, instead of being, as the constitution intends, the final declaration of the people as to the disposition of the public funds, would be subject to the negotiations and bargains of the governor with the beneficiaries, not manifested by any public record, and resting upon private agreements in writing, or in parol. We say in parol, because no distinction can be made, if the power exists, between a parol contract of this character and one in writing. The fiscal officers of the state would not be justified in relying on the sanction of the law for the disbursement of state funds; they would be forced to inquire of the governor and of the beneficiaries to learn whether or not an agreement had been made modifying such laws, or creating an estoppel

against the enforcement thereof. In case of disputes, differ-
ence, or doubts concerning the terms or execution of such agree-
ments, the officers would have to decide as to the truth of the
matter. It is impossible to overestimate the scandals that
might arise under such a system, if it were authorized. The
constitution expressly declares that no payment of public
funds shall be made upon any claim against the state, under
any contract made without express authority of law, and that
all unauthorized agreements or contracts therefor shall be
null and void. (Art. IV, sec. 32.) The entire proceeding
was clearly contrary to public policy.

The agreement in question being wholly void, and also
against public policy, it cannot be the foundation for an
estoppel. Nor can an equitable estoppel be based upon it as
the inducement or consideration which may have led the gov-
ernor to approve the bill which it purports to modify. The
governor was acting in a legislative capacity and his signature
was an act in the process of making a law. It is well
established that the motives which impelled the legislature, or
any component part or member of it, to enact a law, cannot be
made a subject of judicial inquiry for the purpose of invali-
dating, or preventing the full operation of the law. (*Harpend-
ing* v. *Haight,* 39 Cal. 202, [2 Am. Rep. 432] ; *People* v. *Bigler,*
5 Cal. 26; Cooley on Constitutional Limitations, 259 ; 2 Suth-
erland on Statutory Construction, 2d ed., sec. 496; 26 Am. &
Eng. Ency. of Law, p. 569; *People* v. *Glenn,* 100 Cal. 423, [38
Am. St. Rep. 305, 35 Pac. 302].) As the result of this rule
and because, as heretofore shown, it is incompetent, all evi-
dence to show what induced the governor to sign the bill would
be rejected, and the facts upon which the estoppel is supposed
to rest could never be established.

But conceding their existence as alleged, the whole plan
was against public policy, and for that reason the facts are not
sufficient to create an estoppel. The authorities fully support
this proposition. In *People* v. *Board,* 75 N. Y. 42, the salary
of the police surgeon was fixed by law at twenty-two hundred
and fifty dollars. The board of police passed a resolution
appointing Satterlee to the position at a salary of fifteen
hundred dollars. He accepted the appointment, began service
under it, and received part of the salary at the reduced
rate. The board had no power to change the salary. It

was held that the contract, claimed to have been created by the appointment and acceptance, to serve for the salary mentioned in the resolution, was not binding, and that the transaction did not constitute an estoppel against him to prevent him from enforcing payment at the legal rate. The cases of *Kehn* v. *State*, 93 N. Y. 293; *Clarke* v. *State*, 142 N. Y. 105, [36 N. E. 817], and *Rettinghouse* v. *Ashland*, 106 Wis. 595, [82 N. W. 555], are similar in effect. "Contracts, as a general rule, cannot vest in parties any rights in contravention of law or public policy." (*Shorman* v. *Lakin*, 47 Ark. 354, [1 S. W. 560].) "The reason is too obvious to admit of question. The law might, otherwise, at times be evaded, or its policy defeated, by a few strokes of the pen." (*Klenk* v. *Knoble*, 37 Ark. 304.) "An unlawful agreement cannot defeat a lawful right. A contract which is void as being against public policy cannot create an estoppel." (*Tate* v. *Building Assoc.*, 97 Va. 79, [75 Am. St. Rep. 770, 33 S. E. 383].) "Where there is no power or authority vested by law in officers or agents, no void act of theirs can be cured by aid of the doctrine of estoppel." (*Raisch* v. *San Francisco*, 80 Cal. 6, [22 Pac. 22]. See, also, *Oregonian Ry. Co. v. Oregon R. & N. Co.*, 10 Sawy. 479, [23 Fed. 232]; *Sample* v. *Bank*, 5 Sawy. 394, [Fed. Cas. No. 12660]; *Dupas* v. *Wassell*, 1 Dill, 213, [Fed. Cas. No. 4182]; *Webb* v. *Davis*, 37 Ark. 555; *Langan* v. *Sankey*, 55 Iowa, 54, [7 Ñ. W. 393]; *Martin* v. *Zellerbach*, 38 Cal. 311, [99 Am. Dec. 365]; 2 Pomeroy's Equity Jurisprudence, sec. 935.) The consequence of holding this agreement effectual as an estoppel would be to make it valid, notwithstanding the entire lack of power in the governor to demand or accept it and despite its infringement of the express terms of the statute. Such contracts could always be set up as an estoppel and the public policy which prohibits them would be defeated. As said by Mr. Justice Nutter, who wrote the opinion in this case in the district court of appeal, to give the agreement validity in this manner, would "establish a principle at variance with the spirit of our system of government that would enable governors as a branch of the legislative department to exercise in their approval or disapproval of bills a power withheld by the constitution."

The rules which govern the courts in suits in *mandamus* do not authorize the issuance of the writ in the present case.

In *Wiedwald* v. *Dodson,* 95 Cal. 453, [30 Pac. 580], the court
declared the well-established doctrine that it is a discretionary
writ, and that it need not issue to compel an official act not
made imperative by the proper construction of a statute, and
contrary to its spirit, although in strict conformity to its
literal terms.   In *Board of Education* v. *Common Council,*
128 Cal. 369, [60 Pac. 976], a tax had been levied and had
been paid by many of the taxpayers.   It was asserted that
the wrong board had made the levy and a suit in *mandamus*
was begun to compel a levy by the legal board.   The result of
another levy would have been that many of the taxpayers
would have been compelled to pay the same tax twice.   This
court refused the writ and quoted as authority Merrill on
Mandamus, secs. 71-73, to the effect that, "The writ of man-
date will not issue where it will work injustice, or introduce
confusion and disorder, or operate harshly, or where it will
not promote substantial justice."   This is doubtless a correct
statement of the general rule on the subject and in many cases
it controls.   But it has no real application to the case at bar.
The same principles also apply to and control the doctrine of
estoppel in equity.   Yet, as we have seen, a contract which is
illegal and against public policy will not suffice to create an
estoppel.   The writ of mandate is discretionary, and fre-
quently the principles of equity are to be resorted to for the
determination of the question whether or not it should issue.
But these principles cannot be invoked in *mandamus,* any more
than in equity, to enforce agreements which are void in law
and which have been made in violation of public policy; which
would enable the officers of the state to avoid carrying out the
positive mandates of a constitutional statute, and which would
sanction and enforce the doctrine that an act of the legisla-
ture may be modified by an unauthorized contract executed at
the unauthorized demand of the governor.

It has been suggested that the power of a governor who
believes that a sum so proposed to be appropriated to a private
individual to pay his claim against the state exceeds the
amount justly due, is similar to that of a judge engaged in
the trial of a case who believes that the verdict returned by
the jury is excessive.   The conditions are so variant that there
is no real analogy.   The governor has no legal power to reduce
the amount of the claim.   His only course is laid down in

the constitution. He must sign the bill as it is, or he must withhold his approval and return it with his objections to the house in which it originated. The judge, on the contrary, is, for the time being and for the purposes of that case, the repository of the whole judicial power of the state. He may render judgment for any amount he sees fit, and, if no further action is taken by the parties, that judgment will be valid and will stand as the measure of their rights. If it does not conform to the verdict of the jury, or to the agreement of the parties made manifest by their consent to a modification and reduction of the verdict, it may, of course, be reversed on appeal. But unless thus reversed, it is conclusive. There is no lack of power, although there may be an erroneous exercise of it. The governor, in the case supposed, is proceeding entirely beyond his official power and his acts are of no more force, so far as the validity and effect of the agreement is concerned, than if they were those of a private citizen. The judge acts within his powers and in accordance with his duty. The purpose of his official existence is that he may do justice between the parties to the litigation. The governor acts outside of his powers, which in this respect, limit his duty. It is never his duty in such matters to act in excess of his power. The judge does not arbitrarily reduce the verdict and give judgment for a smaller sum. He offers the plaintiff an opportunity to agree to a reduction; if he agrees, the judge has power to render the judgment accordingly; if he refuses, the judge can regularly do nothing more than grant the new trial. In either case he acts strictly within his powers. The conduct of the judge in thus inducing an agreement between the parties and a settlement of the litigation, is not only not illegal nor contrary to public policy, but it is especially encouraged by public policy. It has been sanctioned by the practice of many years in the courts of this country. (See 37 Cent. Dig. cc. 1363, sec. 324.) The power to do this exists at common law and it is therefore authorized by the law of this state. (Pol. Code, sec. 4468.) The governor, if he has such power, could compel the person concerned to yield to his demands and execute any agreement he required, at the peril of losing his entire claim, and such person will have no alterative, except to apply to a succeeding legislature. He has no other appeal. A power so

arbitrary cannot justly or reasonably be implied from anything contained in the constitution, or in our system of government. It is not sanctioned by custom, or even by precedent. It cannot be recognized by the courts until the people confer it in express terms.

A closer analogy would be the case of a judge giving judgment for a certain sum of money and contemporaneously taking an agreement from the plaintiff to accept, in full satisfaction of the judgment, a smaller amount. The defendant, in such a case, might perhaps obtain relief by application under section 473 of the Code of Civil Procedure, or by motion for a new trial, or by suit in equity directly attacking the judgment, provided he began the proper proceeding within the time and in the manner provided by law. But if he suffered that time to pass, he would be bound to pay the judgment in full.. The agreement would form no part of the record, it would not be self-executing, nor could it operate directly upon the judgment of its own force, and it could not be used collaterally to impeach the judgment, or to satisfy it in part. The law has provided no method for the enforcement of an agreement taken by the governor in contravention of the statute he has put in force. The veto or rejection of the entire bill is the only means he has to enforce his objections thereto, and when the bill is signed by him, the case is parallel to that of a judgment when collaterally attacked after the time for direct attack has expired. The agreement could have no effect and proof of it could not be permitted to impair the law or change the judgment.

The judgment is affirmed.

Henshaw, J., Melvin, J., Angellotti, J., Sloss, J., and Lorigan, J., concurred.

BEATTY, C. J.—I dissent and will file an opinion later.*

---

*The protracted illness of Chief Justice Beatty has prevented him from preparing this opinion so as to permit of its publication at this time. It will appear in a subsequent volume of the reports.