**VETO CASE.**

MILLS, Plaintiff, v. PORTER, State Auditor, et al.,
Defendants.

(No. 5,439.)

(Submitted December 18, 1923. Decided January 11, 1924.)

[222 Pac. 428.]

*Constitution—Statutes—Appropriation Bills—Governor — Veto
Power—Adjournment of Legislature—Scaling of Items of
Appropriation Bill—Effect on Applications—Departments
of State Government—Powers.*

Constitution—State—Departments of Government—Exercise of Powers.

1. The powers reposed in either one of the three departments of
state government, neither one of the other two may encroach upon or
exercise, except as in the Constitution expressly directed or permitted.

Same—Law-making Power in Legislature—Restrictions—Veto Power.

2. By the Constitution the whole law-making power of the state is
vested in the legislature, except as the people have expressly or im-
pliedly withheld it and except as restricted by the veto power
entrusted to the governor, his function in that respect being based,
not upon a limitation but upon a grant of power.

Same—Statutes—Character of Veto Power of Governor.

3. The power of the governor over legislation by the exercise of
the veto can only be exercised when clearly authorized by specific
provision of the Constitution; it is distinctly a negative and not a
creative legislative power.

Same—Appropriation Bills—Power of Governor to Scale Items After
Adjournment of Legislature Nonexistent.

4. Under section 13, Article VII, of the Constitution, empowering
the governor "to disapprove of any item or items of any bill making
appropriations of money, embracing distinct items," he may not
scale any particular item or items by deducting a certain per cent
of the amount appropriated by the legislature in a bill which be-
cause of adjournment could not be returned to it for further action,
since by so doing he would be exercising creative legislative power
and usurping the function of the legislative assembly.

Same—Interpretation of Provisions—Duty of Courts.

5. The interpretation to be given a constitutional provision is that
which reasonable minds—the great mass of the people themselves—
would give it, it being presumed that they ratified the Constitution
in the belief that the words employed therein were used in the sense
most obvious to the common understanding.

4. Power of governor to veto part only of statute, see note in 55
L. R. A. 882.

Same—Appropriation Bills—Effect of Unauthorized Scaling of Items After Adjournment of Legislature, on Appropriations.
6. Since under section 12, Article VII of the Constitution, no bill shall become a law after adjournment of the legislative assembly unless approved by the governor, where, instead of approving or disapproving a general appropriation bill as a whole, or approving some of the items therein and disapproving others, he scaled certain items and approved them as scaled, which he was without power to do, his action was neither an approval nor a disapproval, resulting in no appropriations as to such items.

Original application for an injunction by R. M. Mills against George P. Porter, State Auditor, and another. Judgment for plaintiff.

*Mr. R. M. Mills, pro se,* submitted a brief and made oral argument.

*Mr. Wellington D. Rankin,* Attorney General, for Defendants, submitted a brief and argued the cause orally.

*Mr. E. G. Toomey, Amicus Curiae,* submitted a brief.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

The plaintiff, a citizen and taxpayer of the state, asks for an injunction to restrain the state auditor from issuing any warrants of the state of Montana on account of salaries and expenses of the auditor's department for the month of December, 1923, and to restrain the state treasurer from paying such warrants. Defendants have interposed a general demurrer to the complaint. The action involves the power of the governor to veto an item in a general appropriation bill. The attack in the instant case is upon an Act of the Eighteenth Legislative Assembly, designated House Bill No. 402 (Laws 1923, p. 583), entitled "An Act appropriating money for the operation and maintenance of certain of the  * * *  boards, commissions and departments of the state of Montana for the period beginning July 1, 1923, and ending June 30, 1925." The bill was passed by both houses of the legislature on March 1, 1923, and was transmitted to the governor on that day. It bears this indorsement:

"Approved subject to the limitation of appropriation items as specifically set forth in the accompanying letter of transmittal. * * *

"Jos. M. DIXON, Governor."

In the letter of transmittal to the secretary of state the governor said: "Under the provisions of section 13 of Article VII of the Constitution, I withhold my approval from the various items of said appropriation bill contained in section 1 thereof as follows."

He then set forth his action upon the ten items of section 1 of the bill, these relating to appropriations for the fiscal year beginning July 1, 1923, and ending June 30, 1924. One of the items was approved and one disapproved. Action upon the others is fairly indicated by that taken respecting the item relating to the office of the state auditor (upon which plaintiff's complaint is based) which reads as follows: "As to the items of said bill, 'For the salaries and expenses of the office of the state auditor, $83,600.00,' I withhold my approval from said sum of $5,016.00, or the equivalent of six per cent (6%) and approve the same only in the sum of $78,584."

As illustrative of the action of the governor—and this is set forth so that the entire matter may be well understood—the item for the salaries and expenses of the office of the attorney general was scaled ten per cent; of the office of the adjutant-general twenty per cent; of the secretary of state ten per cent; of the state treasurer three per cent; for publishing the state treasurer's quarterly report ten per cent; of the office of railroad commission fifteen per cent; of the office of purchasing agent five per cent. Section 2 of the bill relating to appropriations for the year 1924–25 contained items which were scaled from three to twenty per cent. In his letter the governor said: "I take this action in withholding approval of specific sums and percentages, as set forth above, as against the various items of appropriation on account of the provisions of section 12 of Article XII of the state Constitution which

provides: 'No appropriation shall be made nor any expenditures
authorized by the legislative assembly whereby the expenditures
of the state during any fiscal year shall exceed the total
tax then provided for by law.' '' He had been informed by
the state auditor and state treasurer, he said, that the amounts
appropriated would exceed the tax provided by law, and he
therefore withheld his approval ''of the above items of ap-
propriation in the amounts specifically set forth in order to
bring the revenues of the state, for the fiscal years for which
the appropriations above set forth have been made, within
the revenues of the state for the corresponding fiscal periods.
With the exception of deductions in appropriations above
noted, I hereby approve the bill.''

By reason of the adjournment of the legislative assembly
the governor was prevented from returning the bill within
five days after it was presented to him.

The question presented for solution may be resolved into
two parts: (1) Has the governor the power to veto a part of
an item in an appropriation bill; and (2) if he has not, what
was the effect of his action upon the items he attempted to
scale?

The subject is of first impression in this state. Prior to
this year the governor has not attempted to take such action.

1. At the outset it is well to bear in mind our fundamental
[1] American theory that the people have an original right
to establish for their government ''such principles, as, in
their opinion, shall most conduce to their own happiness,''
and also that this original and supreme will has organized the
government, and has assigned to the three different depart-
ments powers which they may not transgress. (*Marbury* v.
*Madison*, 1 Cranch, 137, 2 L. Ed. 60 [see, also, Rose's U. S.
Notes].) The founding fathers sought to establish a system
of checks and counter checks to maintain in proper poise the
several departments to the end that neither should encroach
upon the rightful powers of the other. They understood
clearly the historic tendency of one department of government

to usurp the function of another. (Norton, The Constitution of the United States, 42.) The evils following the exercise of unrestrained authority, in some instances by the executive, and in others by the Parliament, were written large upon the pages of the history of England. These evils our forefathers sought to avoid by written Constitutions.

The distribution of governmental powers is thus declared in section 1 of Article IV of Montana's Constitution: "The powers of the government of this state are divided into three distinct departments: The legislative, executive and judicial, and no person or collection of persons charged with the exercise of powers properly belonging to one of these departments shall exercise any powers properly belonging to either of the others, except as in this Constitution expressly directed or permitted." (See *State ex rel. Schneider* v. *Cunningham,* 39 Mont. 165, 101 Pac. 962.) These restrictions were prescribed in order that "it may be a government of laws and not of men," as is declared in the Constitution of Massachusetts (Declaration of Rights, Art. XXX); or, as Jefferson expressed it: "In questions of power, then, let no more be heard of confidence in men, but bind him down from mischief by the chains of the Constitution."

By the Constitution, the people, except as they have ex-[2] pressly or impliedly withheld it, reposed in the legislature the whole law-making power of the state. (*People* v. *Draper,* 15 N. Y. 532.) Said Judge Cooley: "In creating a legislative department and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by, the sovereign power of any country, subject only to such restrictions as they may have seen fit to impose, and to the limitations which are contained in the Constitution of the United States. The legislative department is not made a special agency for the exercise of specifically defined legislative powers, but is entrusted with the general authority to

make laws at discretion." (Constitutional Limitations, 7th ed., p. 126.)

As a restriction, a check, upon the comprehensive power granted to the legislative assembly, the people through the Constitution entrusted to the governor the veto power. His function with respect to legislation is based, not upon a limitation, but upon a grant, of power.

The veto is a survival of the law-making authority vested [3] in the King of England as a constituent of the third body of the Parliament, in which he might, and at one time not infrequently did, sit in person. The power existed in the Colonies, and from these it passed with various limitations into nearly all the American Constitutions. Originally the power was intended mainly as a means of self-protection by the executive branch against the encroachments of the legislative branch, but it has been used since as a check upon hasty or inconsiderate as well as unconstitutional legislation. (25 R. C. L. 888.)

While the supreme executive power of this state is vested in the governor (Const., Art VII, sec. 5), he is forbidden to exercise any legislative function except that granted to him expressly by the very terms of the Constitution. (*Lukens* v. *Nye,* 156 Cal. 498, 10 Ann. Cas. 159, 36 L. R. A. (n. s.) 244, 105 Pac. 93; *Fergus* v. *Russel,* 270 Ill. 304, Ann. Cas. 1916B, 1120, 110 N. E. 130; *Stong* v. *People,* 74 Colo. 283, 220 Pac. 999, decided December 3, 1923.) The supreme court of California, in *Lukens* v. *Nye, supra,* says: "His powers, as a part of the legislative department, are specifically enumerated in the Constitution. * * * When exercising these powers he is a special agent with limited powers, and as in the case of other special agents, he can act only in the specified mode and can exercise only the granted powers."

The power of the governor over legislation by the exercise of the veto "can only be exercised when clearly authorized

by a specific provision of the Constitution." (*Stong* v. *People,* *supra.*)

The veto is distinctly a negative, not a creative, power. The general rule is that the governor may not exercise any creative legislative power whatsoever; and it is so in Montana.

"The executive, in every republican form of government, has only a qualified and destructive legislative function and never creative legislative power." (*State* v. *Holder,* 76 Miss. 181, 23 South. 643; *Fergus* v. *Russel, supra; Lukens* v. *Nye, supra; Pickle* v. *McCall,* 86 Tex. 212, 24 S. W. 265.)

The veto power of our governor is based solely upon the following provisions of Article VII of our Constitution: Section 12: "Every bill passed by the legislative assembly shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it, and thereupon it shall become a law; but if he do not approve, he shall return it with his objections to the house in which it originated, which house shall enter the objections at large upon its journal and proceed to reconsider the bill. If then two-thirds of the members present agree to pass the same, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present in that house it shall become a law notwithstanding the objections of the governor. In all such cases the vote of each house shall be determined by yeas and nays, to be entered on the journal. If any bill shall not be returned by the governor within five days (Sunday excepted) after it shall have been presented to him, the same shall be a law, in like manner as if he had signed it, unless the legislative assembly shall by their adjournment prevent its return, in which case it shall not become a law without the approval of the governor. No bill shall become a law after the final adjournment of the legislative assembly, unless approved by the governor within fifteen days after such adjournment. In case the governor shall fail to approve of any bill after

the final adjournment of the legislative assembly it shall be filed, with his objections, in the office of the secretary of state.''

Section 12 was designed to enable the governor to interpose his veto against a bill which he deems objectionable from any cause. This is the original, historic method whereby the governor approves or rejects a bill as a whole. (*Fairfield* v. *Foster* (Ariz.), 214 Pac. 319.)

Section 13: ''The governor shall have the power to dis-[4] approve of any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts approved shall become a law, and the item or items disapproved shall be void, unless enacted in the manner following: If the legislative assembly be in session he shall within five days transmit to the house in which the bill originated, a copy of the item or items thereof disapproved, together with his objections thereto, and the items objected to shall be separately reconsidered, and each item shall then take the same course as is prescribed for the passage of bills over the executive veto.''

Clearly this section has reference only to bills making appropriations of money. Its subject is expressly excepted from the operation of the general mandate of section 23 of Article V of the Constitution (section 23 being designed to prevent ''omnibus'' bills, ''riders'' on bills, and other like evils in legislation), which commands that no bill except general appropriation bills and bills for the codification and general revision of the laws shall be passed containing more than one subject, which shall be clearly expressed in its title.

House Bill 402 was a bill making appropriations of money. For the purpose of this decision it may be assumed that it embraced distinct items, for if it did not then the governor was compelled to approve or disapprove it as a whole under the provisions of section 12. But as we shall see, that the bill was one ''embracing distinct items'' is not disputed.

Section 13 permits the governor either to approve or disapprove of items appearing in appropriation bills. Nowhere

do we find the governor permitted to do otherwise. The governor shall have the power to disapprove any item or items of any bill making appropriations of money, embracing distinct items, and the part or parts approved shall become a law and the item or items disapproved shall be void. Part or parts of what? Manifestly, of the bill. As illustrative: An appropriation bill presented to the governor is made up of a number of items; the governor approves some of the items and disapproves others; the item or items—the part or parts —of the bill approved become law, the item or items disapproved are void.

It is idle to talk of "interpreting" language so plain, or to attempt a "construction" beyond the clear meaning of the words used by the framers of the Constitution, simply because an exigency has arisen. (12 C. J. 703.)

The plain terms of a constitutional provision should prevail. [5] The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. (*May* v. *Topping,* 65 W. Va. 656, 64 S. E. 848.) It is not to be supposed that the people have looked for any abstruse or recondite meaning in employing words in a Constitution, "but rather that they have accepted them in the sense most obvious to the common understanding," and ratified the instrument in the belief that that was the sense designed to be conveyed. (Cooley's Constitutional Limitations, 81.) Furthermore, any interpretation other than the plain meaning of the foregoing words would be violative of the spirit of the Constitution as well as its letter. The interpretation contended for would give to the governor creative power in matters of legislation, and permit the executive to usurp the functions which the people have confided to the legislature alone.

The governor of Illinois once attempted to scale an item under a constitutional provision not dissimilar to our own, whereupon the supreme court of that state said: "The legislative branch of the government is vested with the discretion

to determine the amount which should be appropriated for any particular object. The governor, as the chief executive of the state, is given the right to approve or disapprove of the action of the legislature in making such an appropriation. He may disapprove of it for the reason that in his judgment no appropriation should be made for such a purpose, or for the reason that the amount appropriated is too large, or for any other reason satisfactory to him, but he has not the right to disapprove of a certain portion of an item appropriated and approve of the remainder, and thus perform a function which belongs exclusively to the legislative branch—that of using the discretion necessary to determine the amount which should be appropriated for any particular object.'' (*Fergus* v. *Russel, supra.*)

If the governor could scale an item six per cent as he attempted to do in this instance, he could scale it ninety-six per cent. By reducing the various items he could determine the amount to be appropriated in every appropriation bill coming to him after the close of the legislature. Thus, not the will of the legislature, nor the joint will of the legislature and the governor, but the sole will of the governor, would determine the appropriation of money. That grave danger might result from the policy indicated is apparent. We need not pause to point out the evils certain to result from the untrammeled exercise of such comprehensive and far-reaching power.

The supreme courts of a number of states, which have constitutional provisions similar or somewhat similar to our own, have had occasion to pass upon this subject directly or indirectly. Not one, save Pennsylvania, has affirmed the right of the governor to scale an item in an appropriation bill. In *Stong* v. *People, supra,* the power of the governor to do so is denied distinctly. Colorado's Constitution on the precise point is identical with ours. To the same effect are: *Fergus* v. *Russel, supra; Lukens* v. *Nye, supra; Fairfield* v. *Foster, supra; Nowell* v. *Harrington,* 122 Md. 487, 89 Atl. 1098; *Fulmore* v.

*Lane,* 104 Tex. 499, 140 S. W. 405, 1082. In Illinois the provision is that appropriation bills shall specify "their several amounts in distinct items and sections," "and if the governor shall not approve any one or more of the items or sections in any bill, but shall approve the residue thereof, it shall become a law, as to the residue, in like manner as if he had signed it. The governor shall then return the bill, with his objections to the items or sections of the same not approved by him, to the house in which the bill shall have originated," *etc.*

When *Lukens* v. *Nye, supra,* was decided, the Constitution of California provided that "If any bill presented to the Governor contains several items of appropriation of money, he may object to one or more items, while approving other portions of the bill." The supreme court of that state, in a recent case, *Wood* v. *Riley* (Cal.), 219 Pac. 966, said: "Under the old system, the governor might eliminate, but might not reduce, an appropriation. He could only 'object to one or more items.' (Const., Art. IV, sec. 16.) He may now reduce or eliminate any one or more items of appropriation of money, while approving other portions of the bill. (Const., Art. IV, sec. 34, as amended November 7, 1922.)"

The applicable provision of the Constitution of Oklahoma is section 12 of Article VI, which reads, in part, as follows: "Every bill passed by the Legislature, making appropriations of money embracing distinct items, shall, before it becomes a law, be presented to the governor; if he disapproves such bill, or any item, or appropriation therein contained, he shall communicate such disapproval, with his reasons therefor, to the house in which the bill shall have originated, but all items not disapproved shall have the force and effect of law according to the original provisions of the bill." The similarity between the foregoing provision and our own is readily apparent. In *Peebly* v. *Childers,* 217 Pac. 1049, the supreme court of Oklahoma said: "The fair interpretation of our constitutional provision requires us to hold that the action of

the governor in attempting to approve in part and disapprove in part distinct items of the institutional appropriation bill was, an unauthorized and futile gesture and wholly ineffectual for any purpose.''

Under a constitutional provision similar to our own, the supreme court of Pennsylvania upheld the action of the governor in reducing an appropriation. (*Commonwealth* v. *Barnett*, 199 Pa. 161, 55 L. R. A. 882, 48 Atl. 976.) As against a vigorous dissent the majority held that the words ''item'' and ''part'' were used interchangeably in the following sentence: ''The governor shall have power to disapprove of any item or items of any bill making appropriations of money embracing distinct items, and the part or parts of the bill approved shall be the law, and the items of appropriation disapproved shall be void,'' *etc.*

What we have said above as to the construction of this provision need not be repeated. Since the decision in *Commonwealth* v. *Barnett* was promulgated, it has been commented on by many courts. The conclusion reached by the majority in that case has not been followed by any court. Some have refused to follow it (*Stong* v. *People, supra; Fulmore* v. *Lane, supra; Fairfield* v. *Foster, supra*), while others have distinguished it, or attempted to do so, reaching a contrary conclusion (*Fergus* v. *Russel, supra; Peebly* v. *Childers, supra*).

The principal reason which impelled the majority of the court in the Pennsylvania case to reach the conclusion it did seems to have been that the legislature had violated those provisions which correspond to our sections 12 and 13 by passing what amounted to an omnibus bill and thereby preventing the governor from vetoing items which would have appeared in the bill if it had been properly prepared. The governor's right to veto the bill *in toto* and to call the legislature into extraordinary session for the purpose of passing a proper appropriation bill does not seem to have been considered. In the instant case it is not contended that House Bill 402 was not itemized sufficiently. Beyond doubt the bill

was based upon the budget system which is provided for in
Chapter 20, Part III, of the Political Code, sections 294 to
304, inclusive, Revised Codes of 1921. By this Act, each
department of the state government requiring an annual ap-
propriation from the state shall present a request therefor
to the state board of examiners on or before the fifteenth
day of November of each year preceding a regular session of
the legislative assembly. Blank forms are provided for this
purpose. (Section 297.) By section 298 information and
itemization is required in great detail. By section 299 the
general appropriation bill for the maintenance of the several
departments of the state government and the several state
institutions shall be based upon the budget, but the legislative
assembly may amend the budget by increasing or diminishng
the items therein. The Act requires that the legislative as-
sembly shall not appropriate any money out of the state
treasury except in accordance with its provisions.

So far as we are apprised, the budget was made up properly,
and the itemization contained in House Bill 402 was satis-
factory to the governor. There is no intimation to the con-
trary, and we find the governor referring in his veto message
to the different appropriations included as items. The sole
reason ascribed by the governor for his veto was that the legis-
lative assembly was authorizing expenditures in excess of the
tax provided by law. But the remedy he sought to apply
was not available. He was not remediless, however; he had
the right and the power to veto the bill as a whole, or to veto
every item in it, and to call the legislature into extraordinary
session for the purpose of considering such subjects only as he
desired it to act upon. (*May* v. *Topping, supra; Fulmore* v.
*Lane, supra.*) No matter how praiseworthy may have been
the governor's purpose in attempting to scale the various
items in order to bring the appropriations within the revenues
available, it must be held—for it cannot lawfully be held
otherwise—that when the governor assumed the power he at-
tempted to exercise he was treading upon ground whereon he

had no right to go. His action in attempting to scale the various items was a nullity. (*Fergus* v. *Russel, supra; Regents* v. *Trapp*, 28 Okl. 83, 113 Pac. 910; *Peebly* v. *Childers, supra.*)

2. It was suggested upon oral argument that even if the [6] governor had not the right to scale the item, the appropriation is valid. Some courts have held that way. This upon the theory that as the governor did not disapprove the bill, as a matter of law it must be held that he approved it, for the reason that the attempted veto "was an unauthorized and futile gesture and wholly ineffectual for any purpose" (*Peebly* v. *Childers, supra*), or as is said in *Fergus* v. *Russel, supra:* "The action of the governor in attempting to veto portions of the various items indicated in the veto message was void and without any effect whatever. Those items remained valid enactments just as though the governor had expressly approved of them or had allowed them to become a law without his approval."

But upon an examination of the authorities it will be found that each one holding that way is based upon a constitutional provision which permits a bill to become a law without the governor's approval. (*Stong* v. *People, supra; Peebly* v. *Childers, supra; State ex rel. Jamison* v. *Forsyth*, 21 Wyo. 359, 133 Pac. 521; *Porter* v. *Hughes*, 4 Ariz. 1, 32 Pac. 165; *Callaghan* v. *Boyce*, 17 Ariz. 433, 153 Pac. 773; *Fergus* v. *Russel, supra.*)

In this state "legislative declaration and executive approval are essential prerequisites to the enactment of any law," with the sole exception that a bill may be passed over the governor's veto as the Constitution warrants. It is true that if a bill regularly passed by the legislative assembly is presented to the governor and is not returned by him within five days (Sunday excepted) "it shall be a law in like manner as if he had signed it" (the legislature still being in session); but if he thus permits a bill to become a law without his signature, the Constitution makes this equivalent to his concurrence. It is expressly provided that "No bill shall become a law after

the final adjournment of the legislative assembly unless approved by the governor within fifteen days after such adjournment." Inaction on the part of the governor will not suffice. Affirmative action on his part is required. (*State* v. *Holder, supra; Nowell* v. *Harrington*, 122 Md. 487, 89 Atl. 1098.)

Under the provisions of section 13, when House Bill 402, a general appropriation bill, embracing distinct items, came to him, he was required to approve or disapprove the bill as a whole, or to approve some of the items and disapprove others. He approved two items and disapproved one expressly. The other seventeen, including that upon which this action is based, he neither approved nor disapproved. His action with respect to them was a nullity. The appropriation, therefore, failed.

There is another reason which prevents us from declaring the item valid. Concurrence of the assembly and the governor being necessary to validate it, how can it be said that it became a law when the necessary concurrence was wanting? If we were to hold the appropriation valid for ninety-four per cent only of the amount fixed by the legislature, this would be tantamount to permitting the governor to invade the province of the legislature. If we were to hold it valid for 100 per cent, this would be tantamount to permitting the legislature to invade the province of the governor, for it would be making a law of something to which the governor had refused his assent. The mandate of Article IV of the Constitution must be obeyed.

The demurrer must be overruled. Plaintiff is entitled to the relief he seeks. Let judgment be entered accordingly.

ASSOCIATE JUSTICES COOPER, GALEN and STARK concur.

MR. JUSTICE HOLLOWAY dissents.