[Civ. No. 8893.   First Appellate District, Division Two.—May 5, 1933.]

ROY N. FRANCIS, Respondent, v. LEONARD S. LEAVY, City and County Controller, etc., Appellant.

John J. O'Toole, City Attorney, and Dion R. Holm, Assistant City Attorney, for Appellant.

C. A. S. Frost and Garton D. Keyston for Respondent.

STURTEVANT, J.—The respondent applied to the trial court for a writ of *mandamus* directing the appellant, as Controller of the City and County of San Francisco, to draw his warrant in favor of respondent in the sum of $600 for alleged back pay. The appellant answered and a trial was had before the trial court sitting without a jury. The court made findings in favor of the respondent and from the judgment entered thereon the appellant has appealed.

Prior to January 1, 1932, the respondent was employed as manager of the San Francisco Airport. His compensation was fixed in the sum of $500 per month. The record is entirely silent under what provision of the old charter and under what provisions of any ordinances then in effect the appointment was made. However, the respondent alleged his appointment and the amount of his salary and those allegations were not denied. The new charter of San Francisco took effect on the eighth day of January, 1932. Under the provisions of that charter the airport is placed under the jurisdiction of the public utilities commission. Shortly after the enactment of the charter the members of the public utilities commission were named and thereafter organized and commenced the transaction of business. It was soon ascertained that the funds were running so low that the payroll must be reduced. The matter of the reduction of the salary of the respondent was discussed by the members of the public utilities commission. Something is said in the briefs regarding a resolution passed by the commission reducing the salary of the respondent from $500 to $300. However, the record shows clearly that no such resolution was passed. As manager of the airport it was the duty of the respondent to prepare the time sheets bi-monthly. He did so for the months of March, April and May. On each time-sheet his monthly compensation appeared as $300. The time-sheets were signed by the respondent. Before each payday a pay-roll for each department was prepared and authenticated by the signature of the manager thereof. That practice was followed by the airport and each pay-roll was signed by the respondent. Each employee was paid by a warrant written in his favor. On the back of each warrant above the line for the signature of the payee appeared "the endorsement of this warrant by the payee named herein

constitutes a receipt hereof to the controller, as well as an acknowledgment that the amount thereof is accepted in payment of the services mentioned hereon. ——————'' Each

Endorse here.

one of the warrants drawn in his favor was indorsed by the respondent. He never at any time objected to the amount or claimed any irregularity. The evidence is distinctly conflicting, but there is evidence to the effect that about the end of February the respondent was told that his salary would be reduced and that he replied, "I expected it.'' At the end of May the respondent resigned. Thereafter on July 2, 1932, he commenced this proceeding. By his pleading the respondent claims that for the months of March, April and May he was paid $300 per month and that for each month there remains due and unpaid the further sum of $200, or a total sum of $600 in all. The appellant replies that the respondent's compensation was reduced to $300 effective March 1, 1932, and that all of it has been paid. The appellant further contends that whether the reduction was valid or otherwise the respondent waived any objection. To that reply the respondent avers that no reduction was in fact attempted and that under the charter and the ordinances no reduction could have been made and that he has never waived the point. That a reduction was attempted as a matter of bookkeeping is uncontroverted. The record discloses that the respondent was employed by a committee of the board of supervisors and that his compensation was fixed by the board of supervisors. There is no evidence that the board of supervisors ever attempted to reduce the respondent's compensation. The new charter took effect January 8, 1932. As of that date the airport went under the jurisdiction of the public utilities commission. The manager of the public utilities, with the consent and approval of the commission, has the authority to appoint heads of departments. The salaries of the manager and heads of separate utilities and bureaus shall not exceed prevailing salaries paid those holding similar positions in comparable private employment (sec. 124). Employees of the municipal airport hold their positions at the pleasure of the manager of utilities (sec. 125). Excepting officers or employees whose compensation is expressly fixed in the body of the charter the power to fix salaries of officers and

employees and the manner and exercise of that power is as follows: (1) A standardization ordinance is to be enacted classifying officers and employees and fixing their compensation (sec. 151); (2) annually, not earlier than May 15th and not later than June 1st, a budget ordinance will be passed, including, among other things, salaries and compensation of officers and employees of each department (sec. 72); (3) at the same time an appropriation ordinance will be passed (sec. 72); and (4) at the same time a salary ordinance will be passed (sec. 73). It was alleged and not denied that on January 6, 1932, two days before the new charter took effect, the board of supervisors passed an "annual salary ordinance" which fixed respondent's compensation in the sum of $500. As, according to the provisions of sections 72 and 73, the budget and appropriation ordinances could not be enacted until some time after the fifteenth day of May in any given year, it is not clear that the ordinance of January 6, 1932, had any force or effect prior to May 15th. The record does not show that any other ordinance was passed. ■ It follows that the compensation of the respondent was never altered from the day of his appointment. That appears from what we have said and is fortified by two passages contained in the charter. Section 71, among other things, provides: " . . . Pending the adoption of salary standards as in this charter provided, the salary and wage rates for positions subject to such standardization shall be as recommended by the officer, board or commission having appointing power for such positions and fixed by the budget and annual salary ordinance; provided that any compensation paid as of January 1, 1931, to an incumbent who legally held a position in the city and county service at that time, shall not be reduced so long as such incumbent legally holds such position. . . . " Section 73 provides: " . . . Rates of compensation enumerated shall be those established by salary standardization schedules, and shall not be listed for individuals or individual positions, except where the compensation of incumbents is more than the rate fixed by salary standardization, which compensations shall not be reduced so long as the incumbents legally hold such positions. . . . " From these provisions it is clear that the power to fix compensation for officers and employees and to increase or decrease it rests in the board of supervisors.

Nothing to the contrary appearing in the record, the compensation of the respondent was not reduced.

In the trial court the appellant contended and in this court he contends that as respondent's tenure rested in the discretion of the public utilities commission he could be discharged at any time (sec. 121) and therefore his compensation could be fixed or changed by the commission. The same contention was made under similar statutes in *Pitt* v. *Board of Education,* 216 N. Y. 304 [110 N. E. 612]. On page 613 of 110 N. E., addressing itself to a parallel case, the Supreme Court of New York said: "Under the resolution adopted by the board of aldermen the salary due plaintiff and payable to him at the end of each month was at the rate of $35 a week. The defendant was powerless to fix or regulate the compensation to be paid." (43 C. J. 906.)

The question remains as to whether the acts of the respondent constituted a waiver. That question is not an open one. It has been held that such facts as we have recited do not constitute either a waiver or an estoppel. (*Whiting* v. *Plumas Co.,* 64 Cal. 65 [28 Pac. 445]; *Ellis* v. *Jefferds,* 130 Cal. 478 [62 Pac. 734].) But, it may be said that those cases involved the compensation of officials and that the respondent was not an official but an employee, and that the rules applicable to the two different capacities are not necessarily the same. (*People* v. *Wheeler,* 136 Cal. 652 [69 Pac. 435].) But the rule does not rest solely on an official relation. In *Riley* v. *Mayor etc. of New York,* 96 N. Y. 331, on page 339, that court stated the rule as follows: "When a fixed salary or compensation is provided by law to be paid for services rendered by an individual to the public, or the right to fix such compensation is given to a class of persons, who have performed that duty, it is not competent for another officer whose duty is solely to engage persons to perform the services, to stipulate with them for a smaller rate than that provided by the established regulations." (Citing cases.) In *Pitt* v. *Board of Education, supra,* the plaintiff had executed a formal release, a document as broad as the indorsement written on the checks by this respondent. The court held it was no waiver. In *Lukens* v. *Nye,* 156 Cal. 498 [105 Pac. 593, 20 Ann. Cas. 158, 36 L. R. A. (N. S.) 244], the court cited and followed the New York cases. In that case the legislature had passed a statute appropriating

$45,616.30 in payment of the claim of John Mullan. The Governor of the state was about to veto the bill. Thereupon the claimant came forward and executed a release of nearly one-half of the sum so appropriated by the legislature. The Governor signed the bill. The claimant collected the portion not released and then commenced an action in *mandamus* to compel the payment of the remaining portion. In holding that the facts did not constitute an estoppel, at page 506 of 156 Cal. the court said: "The consequence of holding this agreement effectual as an estoppel would be to make it valid, notwithstanding the entire lack of power in the Governor to demand or accept it and despite its infringement of the express terms of the statute. Such contracts could always be set up as an estoppel and the public policy which prohibits them would be defeated." Resting their opinions on the same reasoning the courts have held that under such facts as are presented in this record no waiver was created (*People* v. *Mantei,* 134 Misc. Rep. 529 [236 N. Y. Supp. 122, 125]; *Metz Co.* v. *Boston & M. R. R.,* 227 Mass. 307 [116 N. E. 475, 476]; 40 Cyc. 255).

We find no error in the record. The judgment is affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on June 30, 1933.