THIRTEENTH GUAM LEGISLATURE
et al., Plaintiffs,

v.

Ricardo J. BORDALLO, the Governor of
Guam, et al., Defendants.

Civ. No. 76–038 WHO.

District Court of Guam.

Feb. 14, 1977.

James S. Brooks, Brooks & Klitzkie, P. C., J. Bradley Klemm, Klemm & Dear, Agana, Guam, for plaintiffs.

Charles H. Troutman, III, Atty. Gen., Government of Guam, Agana, Guam, for defendants.

## OPINION AND ORDER

ORRICK, District Judge.

The Guamanian Legislature and several citizens employed by the government brought this suit for declaratory and injunctive relief to challenge the manner in which the Governor of Guam has applied his item veto power to the budget for the fiscal year ending June 30, 1977 (FY 1977). They contend that the Governor exceeded his executive function and assumed a creative role properly reserved to the Legislature by (1) in effect providing for nine government agencies for FY 1977 the budgetary sums appropriated for the fiscal year ending June 30, 1976 (FY 1976), after he had reduced to zero the FY 1977 appropriations for these departments; (2) reducing the amount of certain appropriations while not vetoing the items *in toto* ; (3) reducing to zero the appropriations for the offices of Governor and Lieutenant Governor, which are departments specifically created by the Organic Act of Guam, 48 U.S.C. § 1422 (the Act); and (4) vetoing specific words, phrases, and conditions of appropriations.

Plaintiffs moved to restrain the Governor from reinstating legislative appropriations for FY 1976 and to require disbursement of the 1977 appropriations as proposed by the Legislature. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, by order of this Court issued August 10, 1976, the hearing on the merits was advanced and consolidated with the hearing on the preliminary injunction.

For the reasons set forth below, the motion for an injunction is granted.

I.

On June 15, 1976, the Governor of Guam was presented with two appropriations bills for FY 1977. Substitute Bill 790, now Public Law 13–148, appropriated funds for the Territorial Highway Fund; Substitute Bill 791, now Public Law 13–149, appropriated funds for the executive and judicial branches of government. Dissatisfied with the legislative appropriations in these bills, the Governor reduced appropriations for nine government departments to zero. Included among these departments were the offices of the Governor and Lieutenant Governor, which are specifically created by the Act. Invoking the provisions of 48 U.S.C. § 1423j(b), which provides for the automatic reappropriation of the prior year's funds in the event the legislature fails to pass neces-

sary appropriations bills for the current fiscal year, the Governor continued to finance expenditures for these nine departments based on the appropriations made for the preceding year. Since the Legislature had intended to scale down appropriations for these departments with its 1977 budget, the net effect of the Governor's actions was to maintain spending at $1,581,656 above the amount authorized by the Legislature for these departments for FY 1977.

In reviewing the two appropriations bills the Governor also deleted specific words and phrases which imposed conditions on the appropriations such as the reversion of sums to a general fund (P.L. 13–148, section 3, part 3) and the regulation of salary step increases for public employees (P.L. 13–148, section 1, part 6). Finally in reviewing the appropriation bills, in several instances the Governor scaled down, without eliminating *in toto*, sums appropriated for personal benefits under Substitute Bill 790 and for the University of Guam under Substitute Bill 791.

■■■ This Court holds that the Governor may not, by vetoing appropriations to government departments, reinstate the previous year's appropriations; nor may he selectively veto words, phrases, and conditions in a bill containing several items of appropriation. On the other hand, he is authorized to reduce, without eliminating, items of appropriation; similarly, he may properly veto to zero appropriations for Governor and Lieutenant Governor.

## II.

While this decision is grounded primarily on analysis of Guam's veto provisions and case law construing similar statutes, it was not made without reference to the historical evolution of the veto power. This development both provides a context in which to examine the present problem and suggests the permissible bounds within which the power may operate.

## A.

The concept of veto [1] power has its genesis in the ancient Roman constitutional scheme. As early as 494 B.C.,[2] tribunes of the plebeians were given *intercessio*, the right to veto any magisterial act, including the bringing of a bill before the assembly.[3] Magistrates of equal or higher rank could likewise intercede against the acts of fellow magistrates.[4]

The use of the veto power can, in fact, be seen as an essential element of the Roman system of checks and balances. Rather than dividing the government into branches, the Romans granted political officials extensive authority but subjected their exercise of this power to veto by a colleague, higher official, or tribune of the plebs.[5]

---

1. "I forbid." For a wide-ranging treatment of the origins and evolution of the presidential veto power, *see The Veto Power of the President*, 12 F.R.D. 207 (House of Representatives, Committee on the Judiciary, adapted from a dissertation by C. Zinn, Law Revision Counsel). (hereinafter cited as 12 F.R.D. 207).

2. This year is the supposed date of the "First Secession of the Plebs," in which the plebeians left the city to return only after receiving certain concessions, among them the tribunician *intercessio*. H. F. Jolowicz & B. Nicholas, *Historical Introduction to the Study of Roman Law* 12 (3d ed. 1972).

3. *Id.*, 12 F.R.D. 207, 210. The veto power extended to any public deliberation (M. Radin, *Handbook of Roman Law* 55 (1927)) and could be invoked against admission to offices as well as decisions of officials and Senate. H. Wolff, *Roman Law: An Historical Introduction* 10 (1964). (hereinafter cited as *Wolff*). Original-

ly, the tribunes were *not* empowered to intercede against dictators, who were named by consuls to take command only during emergencies. *Id.* at 36. *See also* W. Kunkel, *An Introduction to Roman Legal and Constitutional History* 21 (J. M. Kelly trans. 1966). The tribunes acquired this right around the third century B.C. but apparently used it sparingly, at best. H. F. Jolowicz & B. Nicholas, *Historical Introduction to the Study of Roman Law* 55 (3d ed. 1972).

4. *Wolff, supra*, note 3, at 30. The mutual right of veto among colleagues is often described specifically as the principle of "colleagueship." *Id.*

5. *Id.* at 26–28. The tribune's power was in turn balanced by the fact that plebiscites, enactments of the plebeian assembly, bound only plebeians unless previously approved by the Senate, at least until 287 B.C. *See* W. W.

Despite the strength of the veto power,[6] however, it remained a decisively negative tool—it could not be used to compel affirmative action.[7]

In England, prior to the Norman conquest, legislative power resided in the King in Council.[8] During the Middle Ages, this power gradually shifted to Parliament,[9] and by the last years of Edward III's reign, most legislation originated in Parliament.[10] While kings to the end of the Middle Ages sometimes modified statutes or ordinances in approving them, they did not attempt drastic revisions; moreover, Commons in 1414 secured the right to act on the amendments.[11]

Despite the abandonment of the crown's creative legislative role, monarchs continued to use the veto to reject altogether bills passed by both houses of Parliament.[12] Coupled with this power was the notion that bills could not become acts or statutes unless approved by the king.[13] Refusals were commonplace early in Parliament's evolution; often the king or queen in person would exercise the veto by reciting the customary phrase, *"Le Roy s'avisera."* [14]

Gradually, the veto power fell into disuse. William III exercised it only three times, each time to the displeasure of Parliament. Queen Anne, who exercised the veto once in 1707, was the last monarch to invoke it.[15]

In the American colonies, legislation was generally subject to two forms of absolute veto. First, the governor could refuse to assent to a bill.[16] Furthermore, the crown could veto colonial legislation even after the governor had given his assent.[17] Apparent-

Buckland, *A Text-Book of Roman Law from Augustus to Justinian* 4 (3d ed. rev'd. by P. Stein 1963); 12 F.R.D. 207, 210.

**6.** One example is the enlistment, by a minority in the Senate, of the tribunician veto to block resolutions passed by the Senate. *See Wolff, supra*, note 3, at 43.

**7.** *Id.* at 73. For example, a magistrate's refusal to authorize a trial could not be reversed by use of the tribunician veto. *Id.*

**8.** A. V. Dicey, *Introduction to the Study of the Law of the Constitution* 48 (8th ed. 1915) (hereinafter cited as *Dicey*); *see* 12 F.R.D. 207, 211. The Anglo-Saxon assembly (Witenagemot) which participated in general government with the king was not a representative body. The king probably determined who would attend meetings, bound only by the realization that certain people were simply too important to be omitted. *See* G. Adams, *Constitutional History of England* (1931) (hereinafter cited as *Adams*); *cf.* 12 F.R.D. at 211.

**9.** Dicey notes, however, that even after the beginning of Parliamentary legislation, a parallel system of royal ordinances and, later, proclamations allowed the monarch legislative authority equivalent to that of Parliament. *Dicey, supra*, note 8, at 48; 12 F.R.D. 207, 211. *See, e. g.*, Act 31 Henry VIII 1539 (allowing legislation by proclamation—quoted in *Dicey* at 48–49).

**10.** M. M. Knappen, *Constitutional and Legal History of England* 256 (1964) (hereinafter cited as *Knappen*); 12 F.R.D. 207, 211.

**11.** *See Knappen, supra*, note 10, at 257, 12 F.R.D. 207, 211.

**12.** *Knappen, supra*, note 10, at 257.

**13.** S. B. Chrimes, *English Constitutional History* 13 (3d ed. 1965).

**14.** *Id.* The words mean: "The king will consider it." Even today, royal *assent* is expressed (now largely by commissioners appointed by the king or queen) in similar terms. Assent to public non-financial bills is indicated by the phrase, *"Le Roy le veult"* ("the king wishes it"); finance bills, which provide revenue to the king, are accepted with the assurance that *"(l)e Roy remercie ses bons sujets, accepte leur benevolence et ainsi le veult"* ("the king thanks his good subjects, accepts their benevolence and so wishes it"). Private bills are assented to by the words *"Soit fait comme il est desire"* ("Let it be done as is desired"). *Id.* The House Committee on the Judiciary notes that Queen Elizabeth in 1597 vetoed more bills than she accepted and that James I considered it a special favor to Parliament that he passed all acts presented to him. 12 F.R.D. 207, 211.

**15.** *Adams, supra*, note 8, at 373; 12 F.R.D. 207, 211.

**16.** *Dicey, supra*, note 8, at 112. The House Judiciary Committee notes that Maryland, which recognized no gubernatorial veto, and Rhode Island and Connecticut, where governors were elected for one-year terms, were the only colonies whose charters did not grant governors the veto. 12 F.R.D. 207, 212.

**17.** *Dicey, supra*, note 8, at 112.

ly, the king felt less hesitant to exercise his absolute veto abroad than to wield it at home. The Declaration of Independence rues the monarch's refusal to "Assent to Laws, the most wholesome and necessary for the public good."[18]

It thus comes as no surprise that Alexander Hamilton, in his defense of the proposed Constitution, was careful to distinguish the "absolute negative" available to the British monarch from the "qualified negative" of the President,[19] whose veto may be overridden. Hamilton noted the long disuse of the power in England but emphasized that it was no less real than ever. He attributed reluctance of the crown to invoke the power to the development of alternative techniques of control (through influence-wielding or gaining parliamentary support) less repugnant to the country.[20]

According to Article I, Section 7, Clause 2 of the Constitution, "Every bill[21] which shall have passed the House of Representatives and the Senate" is to be presented to the President. The presidential veto may be overridden by a two-thirds vote of each House of Congress. Despite the availability of the override, the power of the veto is extensive, as attested by the fact that not one bill was passed over the presidential veto during the first fifty years of the republic.[22]

Woodrow Wilson termed the veto the "most formidable prerogative" of the President[23] and determined that "[t]he President is no greater than his prerogative of veto makes him; he is, in other words, powerful rather as a branch of the legislature than as the titular head of the Executive."[24]

While the veto power may be seen as allowing the executive to intrude on the legislative branch, thus doing violence to the concept of separation of powers, both Woodrow Wilson and his earlier counterpart Alexander Hamilton suggested that the veto was necessary as a defense against unwarranted incursions by an all-powerful legislative branch. Hamilton suggested that the veto power was both theoretically and realistically necessary to *preserve* the separation of powers, to remedy the "insufficiency of a mere parchment delineation of the boundaries" of the executive and legislative branches, as well as to prevent enactment of improper laws.[25] Wilson noted the steady increase of legislative power at the expense of executive power, indicating that the veto is an essential defensive tool.[26]

■ This emphasis on the self-defensive aspect of the veto underscores the idea that the veto is only a *negative* power. Were it capable of creative as well as destructive use, there would be no question that the executive would be able to usurp the legislative function and irreparably undermine rather than preserve the integrity of the separation of powers.

18. *See* 12 F.R.D. 207, 212.

19. The Federalist No. 69 (Hamilton).

20. *Id.* Cromwell's Instrument of Government, which was enacted without parliamentary or popular sanction, offered an interesting alternative to the British scheme. The Instrument provided that all bills passed by Parliament were to be presented to the protector. If the protector did not consent within twenty days or "give satisfaction to the parliament within the time limited," they would become laws unless they were found unconstitutional. Presumably, "giving satisfaction" would require persuading Parliament. The result is apparently that an ordinary majority could override the protector's veto. *Adams, supra,* note 8, at 326, 328.

21. Despite the language, certain types of measures are not sent to the President (e. g., congressional resolutions proposing amendments to the Constitution). J. Mathews, *The American Constitutional System* 149 (2d ed. 1940).

22. 12 F.R.D. 207, 215, citing Laski, *The American Presidency* 143 (1940).

23. W. Wilson, *Congressional Government: A Study in American Politics* 52 (1885).

24. *Id.* at 260; *see* 12 F.R.D. 207, 212.

25. The Federalist No. 73 (Hamilton).

26. *See* W. Wilson, *Congressional Government: A Study in American Politics* 51–52 (1885).

## B.

The Constitution does not grant the President the power to veto parts of bills. This omission of an item veto power has been repeatedly criticized as forcing the President to choose between approving appropriations bills which contain unnecessary items of expenditure and vetoing otherwise laudable or necessary legislation.[27]

The first such criticisms appeared around the time of the Civil War, when Congress began to add riders to appropriations bills.[28] Reflecting the dissatisfaction with the limitations of the constitutional veto, the Confederate States included in their provisional constitution, adopted February 8, 1861, a section permitting presidential veto of selected items of appropriation within an appropriation bill.[29] The permanent constitution contained essentially the same measure.[30]

The states were quick to follow suit, led by Georgia in 1865 and Texas in 1866. The vast majority of states now enable their governors to veto items in appropriation bills.[31] Moreover, Congress granted this power to the Governor General of the Philippine Islands and to the Governors of Alaska, Hawaii, Puerto Rico, and the Virgin Islands.[32]

While the item veto, as limited to items of appropriation, has thus become generally available to the executives of states and territories alike, there is considerable variation among provisions as to the precise limits of the power. This variation is attributable to the variety of language used to grant the item veto and to the multiplicity of interpretations to which this language is amenable. Nevertheless, the notion that "the executive, in every republican form of government, has only a qualified and destructive legislative function, and never creative legislative power" undergirds each item veto provision. (*State v. Holder*, 76 Miss. 158, 23 So. 643, 645 (1898).) Consistent with this notion, the executive in almost all instances is able only to approve or reject a bill in its entirety. (*Bengzon v. Secretary of Justice*, 299 U.S. 410, 412, 57 S.Ct. 252, 81 L.Ed. 312 (1937).) The item veto power must be seen as a narrow exception to the general rule of approval or disapproval *in toto*, specifically designed to "safeguard the public treasury against the pernicious effect of . . . 'log-rolling' . . . ." (299 U.S. at 415, 57 S.Ct. at 254). Its purpose is not to enable "affirmative legislation by executive edict" (299 U.S. at 414, 57 S.Ct. 252. *See Fitzsimmons v. Leon*, 141 F.2d 886, 888 (1st Cir. 1944); *Mills v. Porter (The Veto Case)*, 69 Mont. 325, 222 P. 428 (1924); *State ex rel. Sego v. Kirkpatrick*, 86 N.M. 359, 524 P.2d 975 (1974)), and its use as a creative tool must be deemed impermissible.

## III.

Title 48 U.S.C. § 1423j(b) provides that if at the end of any fiscal year the legislature has "failed to pass" appropriation bills covering current expenses and legal obligations for the ensuing year, the sums appropriated "in the last appropriation bills for the ob-

---

27. *See* J. Mathews, *The American Constitutional System* 151 (2d ed. 1940); 12 F.R.D. 238–41 (suggesting that the problem could be solved by defining the term "bill" as "a legislative instrument setting forth one or more propositions of law, all related, however, to a single subject matter.") 12 F.R.D. at 240.

28. 12 F.R.D. 207, 239; Beckman, *The Item Veto Power of the Executive*, 31 Temple L.Q. 27 (1957).

29. 12 F.R.D. 207, 239.

30. *Id.* The House Judiciary Committee study cites Provisional Constitution of C.S.A., Art. I, § 5 and Constitution of C.S.A., Art. I, § 7.

31. *Id.* *See* note 34, *infra*.

32. Beckman, *The Item Veto Power of the Executive*, 31 Temple L.Q. 27, 27–28 (1957); *see* 48 U.S.C. § 1052 (Philippine Islands—now obsolete); 48 U.S.C. § 86 (Alaska—now omitted); 48 U.S.C. §§ 581–83 (Hawaii—now omitted); 48 U.S.C. § 825 (Puerto Rico—since repealed); 48 U.S.C. § 1405o (Virgin Islands). Only eight states—Indiana, Maine, Massachusetts, Nevada, New Hampshire, North Carolina, Rhode Island, and Vermont—do not have a provision for an executive item veto.

jects and purposes therein specified, as far as the same may be applicable, shall be deemed reappropriated item by item." The defendants here assert that pursuant to this provision the previous year's budget will take effect for all items which the Governor has vetoed to zero.

Were this interpretation correct, the Governor's item veto power would afford him impermissibly creative powers. Each year, the Governor would have a choice between the new appropriations and those currently in effect. *See In Re Hawaiian Star,* 15 Haw. 532 (1904) (separate opinion of Galbraith, J.).[33]

A somewhat analogous situation was discussed by the Court of Appeals for the First Circuit in *Buscaglia v. District Court of San Juan,* 145 F.2d 274 (1st Cir. 1944). The legislature in that case had passed a non-fiscal year emergency appropriation for war relief (the Supreme Court of Puerto Rico had previously determined that the appropriation was intended as a once-only measure). The court found that the Puerto Rican Organic Act's reenactment provision, similar to the Guamanian provision, did not apply to the appropriation. Automatic renewal, the court determined, "would alter the legislative intent by allocating a greater sum to emergency relief than the legislature intended to allocate for that purpose." 145 F.2d at 286.

Were the governor able to reactivate the prior appropriations by vetoing a current year's measures, he could similarly create a larger budget than the legislature intended. In the case at bar, if last year's fiscal appropriations are deemed to be reappropriated,

government spending would be increased by $1,581,656.

Moreover, the language of the Act itself suggests that there is a distinction between the legislature's failure to pass appropriations and its inability to *enact* such measures. 48 U.S.C. § 1423i provides that "[e]very bill *passed* by the legislature shall, before it becomes a law, be entered upon the journal and presented to the Governor." (emphasis added.) *Passage* is thus considered to be the first step toward enactment. If this section is to be read in harmony with Section 1423j(b), the Court must conclude that it is the legislature, rather than the governor, which controls the automatic reenactment provision.

■ A number of other courts have concluded that a bill is *passed* when it has gone through all possible legislative channels and is submitted to the executive for enactment. *Board of Education v. Morgan,* 316 Ill. 143, 147 N.E. 34 (1925); *Amos v. Gunn,* 84 Fla. 285, 94 So. 615 (1922); *State ex rel. Schwartz v. Bledsoe,* 159 Fla. 243, 31 So.2d 457 (1947).

Thus, there is a distinction between the legislature's failure to pass an appropriations bill and the legislature's inability, when faced with a gubernatorial veto, to enact certain appropriations which have been legislatively approved. It is the former situation alone which invokes the reenactment provisions of Section 1423j(b). Since in the present case the Legislature did pass appropriations for FY 1977, the Governor's veto did not invoke provisions for FY 1976.

---

**33.** Defendants' reliance on the majority opinion in *In Re Hawaiian Star Newspaper Assoc. Limited,* 15 Hawaii 532 (1904) is misplaced. There, it is true, the majority determined that the legislature had failed to pass fiscal appropriations and that the preceding year's appropriations were automatically reinstated. The legislature in *In re Hawaiian Star,* however, unlike the Guamanian legislature, had actually adjourned its regular session without presenting appropriation bills to the governor. In a special session, the legislature did pass bills providing for salaries and expenses. Nevertheless, because the legislature assumed that certain necessary functions were to be funded by the county, rather than the territorial government, it did not pass legislation to cover these county-borne expenses. The county legislative scheme was declared invalid, leaving the territory without appropriations for necessary business. In that case, the legislature had indeed failed to pass and failed to present to the governor proposals to cover all necessary appropriations. Here, in contrast, the legislature took all measures within its powers to make all necessary fiscal appropriations for FY 1977. It is owing to the exercise of the gubernatorial veto, not to an oversight of or lack of consensus within the legislature, that the 1977 appropriations did not take effect.

## IV.

As a corollary to the proposition that the creation of legislation is the province of the legislature, this branch is customarily granted the power to override the governor's veto of legislation, customarily by an affirmative vote of two-thirds of each house. The overwhelming majority of states which allow gubernatorial item vetoes provide expressly for legislative override.[34] The Act does not. Instead, the section concerning approval of bills mentions generally the legislature's power to override vetoes by securing a two-thirds vote of the legislature and then describes specifically the procedure which the governor is to follow in exercising his item veto power.[35] According to the section, the governor is to sign the bill and append to it a statement of the items to which he objects; thereafter, the parts to which he has objected "shall not take effect."

This language is subject to conflicting interpretations. One possibility is that the governor's item veto cannot be avoided by further legislative action. Equally plausible, however, is the conclusion that the language is intended "to enable the governor to approve and make law some appropriations, and to put others (those which do not "take effect") to the test of securing a two-thirds vote of the legislature as the condition of becoming law." *See State v. Holder, supra,* 23 So. at 644. The Mississippi constitution discussed in *Holder,* like the Act, contained no specific mention of override power applicable to the item veto. Moreover, in both documents, the item veto provision follows the provision on approval.[36]

Significantly, the United States Supreme Court in *Bengzon v. Secretary of Justice, supra,* though discussing a different aspect of the Philippines' item veto, quoted the language in *Holder* describing the purpose of the item veto and explaining that it enables the governor to make law some appropriations while insisting that others be put to the test of override.

The Oregon item veto section (one of the few with no express override grant) like the Mississippi provision and unlike that of Guam, is contained in a section separate from the general approval section. The only additional relevant difference is that the item veto section in Oregon's constitution *precedes* the general approval section; in Guam's Act, the order is reversed. The

---

**34.** Forty of the forty-two states allowing item vetoes specifically empower the legislature to override vetoes.

**35.** 48 U.S.C. § 1423i provides in pertinent part: "Every bill passed by the legislature shall, before it becomes a law, be entered upon the journal and presented to the Governor. If he approves it, he shall sign it, but if not he shall, except as hereinafter provided, return it, with his objections, to the legislature within ten days (Sundays excepted) after it shall have been presented to him. If he does not return it within such period, it shall be a law in like manner as if he had signed it, unless the legislature by adjournment prevents its return, in which case it shall be a law if signed by the Governor within thirty days after it shall have been presented to him; otherwise it shall not be a law. When a bill is returned by the Governor to the legislature with his objections, the legislature shall enter his objections at large on its journal and, upon motion of a member of the legislature, proceed to reconsider the bill. If, after such reconsideration, two-thirds of all the members of the legislature pass the bill, it shall be a law. If any bill presented to the Governor contains several items of appropriation of money, he may object to one or more of such items, or any part or parts, portion or portions thereof, while approving the other items, parts, or portions of the bill. In such a case he shall append to the bill at the time of signing it, a statement of the items, or parts or portions thereof, to which he objects, and the items, or parts or portions thereof, so objected to shall not take effect."

**36.** In *State v. Holder,* 76 Miss. 158, 23 So. 643 (1898), the Mississippi Supreme Court speculated that the item veto might not be subject to the general override provision, but expressly declined to venture an opinion on the subject. Of course, acts *in pari materia* must be construed together as forming one act. *See* 2A Sutherland, Statutes and Statutory Construction, § 51.01 (4th ed. 1973). *A fortiori,* sentences within the same section of an act are to be read consistently with each other. Thus, the override provision should apply to the item veto portion of Section 1423i as well as to the general veto portion.

Attorney General of Oregon, after considering the two sections, concluded:

> "The people of the state in providing for items vetoes by the governor by the amendment of the constitution containing the same, having not provided any special procedure by the legislature, or the secretary of state as to such item vetoes, it is but reasonable to suppose that the intention is that the same procedure shall be followed as to item vetoes as is followed when the whole bill is vetoed . . . ." Op.Att'y Gen. of Oregon, 1932–34, pp. 478, 479.

The only variation in the case of item vetoes, the Attorney General said, was that "the vote in each house shall only be upon the items vetoed." Op.Att'y Gen., *supra,* at 480.[37]

Consideration of the Organic Acts of Puerto Rico (48 U.S.C. § 825); Alaska (48 U.S.C. §§ 85–86); the Virgin Islands (48 U.S.C. § 1405*o*); and Hawaii (48 U.S.C. §§ 581–83) reveals that none of these acts distinguishes specifically between general vetoes and item vetoes in terms of override.[38]

■ The legislative history of Guam's Act and its amendments by Congress lends support to the conclusion that the Legislature can override an item veto. The language of the present 48 U.S.C. § 1423i expressly provides for return to the Legislature of any bill disapproved by the Governor "except as hereinafter provided." Plaintiffs reason persuasively that "as hereinafter provided" referred originally to a *since-deleted* mechanism by which the Governor could send a bill as to which his veto had been overridden but which he still disapproved to the President of the United States, who could block enactment of the bill or effect its enactment.[39] The legislative analysis of the amendment deleting this provision states, "The section . . . provides for the reconsideration of legislation returned by the Governor with his objections thereto." 1968 U.S.Code Cong. & Ad.News p. 3564 *et seq.* No reference is made to the legislature's inability to override item vetoes. No distinction between item and general vetoes is apparent. The "hereinafter" clause was retained after deletion of the Presidential review clause, plaintiffs assert, because the governor still need not return a disapproved bill to the legislature if the legislature has prevented return by adjourning.[40]

Finally, the principle that the construction which will preserve a measure's constitutionality will prevail[41] suggests that Section 1423i should be read as allowing legislative override of item vetoes. The Act

---

**37.** The Attorney General affirmed his original position a few years later. *See* Op.Att'y Gen. 1936–38, at 201, 202.

**38.** The Puerto Rican provision (since repealed) contains virtually the same language as Guam's act concerning item veto though it also has provision for transmission by the governor to the President of the United States if the governor still disapproves after the legislature has overridden a veto. The Alaska and Hawaii provisions (now omitted) and the Virgin Islands act are clearer in their application of the override power to item vetoes, but the Virgin Islands act also allows transmission to the President. The Guam provisions for presidential review have been deleted. See discussion *infra.*

**39.** Section 19 of the Organic Act, 48 U.S.C. § 1423i originally provided for the President's limited veto of territorial legislation. P.L. 630, 64 Stat. 389, Aug. 1, 1950, c. 512, § 19. Section 8 of the Guam Elective Governor Act, P.L. 90–497, 82 Stat. 847, Sept. 11, 1968, deleted this provision.

**40.** In the usual case, the bill becomes a law *unless returned* to the legislature within ten days. If the legislature has adjourned, however, a bill does not become law *unless signed* by the governor within thirty days. It also seems reasonable to conclude that since the "hereinafter" clause did *not* originally refer to the item veto portion, it did not acquire this meaning simply because of the amendment. *Cf.* Sutherland, *supra,* note 36, § 51.02: "Unless the context indicates otherwise, words or phrases in a provision that were used in a prior act pertaining to the same subject matter will be construed to be used in the same sense." *See also* § 51.01: "An amendment and the unchanged portion of the original act should be construed together." Here, the amendment was the deletion of the presidential approval mechanism.

**41.** *See* Beckman, *supra,* note 32, at 29.

provides in Section 1421a that "[t]he government of Guam shall consist of three branches, executive, legislative, and judicial. . . . " The integrity of the legislative branch would be impermissibly undermined, and the function of the governor unnecessarily enlarged, if the governor's veto of specific items of appropriation were not subject to override by a two-thirds vote of the legislature as are his vetoes of entire bills.

■ The result of the legislature's power to override item vetoes is of critical importance in this case. Since the Governor did not return the budget to the Legislature within ten days, as specified in Section 1423i, the budget *as originally* passed by the legislature *became law.*

## V.

■ The defendants assert that the Governor may reduce as well as veto *in toto* the items in an appropriations bill. They rely on the language of Section 1423i, which provides in pertinent part:

" . . . If any bill presented to the Governor contains several items of appropriation of money, he may object to one or more of such items, or any part or parts, portion or portions thereof, while approving the other items, parts, or portions of the bill."

The Governor argues that the inclusion of the phrase "part or parts, portion or portions thereof" authorizes such reduction.

This position finds clear support in *Blanch v. Cordero,* 180 F.2d 856 (1st Cir. 1950). In construing almost identical language in Section 34 of Organic Act of Puerto Rico,[42] the court in *Blanch* held that the governor had the power to reduce as well as to strike items in an appropriations bill. In reaching this conclusion, the court reasoned that the word "thereof" referred to "items" rather than "bill." The court mentioned

that the Supreme·Court of Puerto Rico had rejected an argument to the contrary in *De La Rosa v. Winship,* 47 P.R.R. 312 and subsequently in dictum in *Leon v. Fitzsimmons,* 61 P.R.R. 340. Moreover, the Court of Appeals for the First Circuit, in reviewing the *Leon* case, had "brushed [the argument that "thereof" referred to "bill"] aside in dictum." *Blanch v. Cordero, supra,* at 858. The Court noted that it was "not aware" that "thereof" must refer to a singular antecedent, citing an earlier decision in which the Massachusetts Supreme Court had construed the word as referring to a plural noun. *See Commonwealth v. Bralley,* 3 Gray. 456, 69 Mass. 456.

Whatever the merits of this grammatical construction, the court in *Blanch* relied primarily on the legislative history of the section, observing that as originally introduced, the bill gave the governor the power to object only to "one or more of such items," but that it was amended on the senate floor to add the words "or any part or parts, portion or portions thereof." 54 Cong. Rec. 2256. Reasoning that the "[p]ower to veto parts of an appropriations bill adds nothing to the power to veto any or all of its individual items," the court concluded that there was "no doubt" that the Organic Act as amended granted the governor the power to scale down as well as veto *in toto* any item in the bill. 180 F.2d at 858.

This last rationale is strengthened by the proposition, discussed *infra,* that the governor may not alter words, phrases, or conditions of a bill containing items of appropriation. Since his item veto power is limited to the rejection of items of appropriation, the power to veto parts or portions *of a bill* would necessarily refer only to the power to strike items of appropriation. Thus, the phrase "part or parts, portion or portions" would indeed be meaningless surplusage unless it modified the word "items."[43]

**42.** 39 Stat. 960, 48 U.S.C. § 825 (repealed in 1950 by Act of July 3, 1950, c. 446, § 5(2), 64 Stat. 320) provided in pertinent part: "If any bill presented to the governor contains several items of appropriation of money, he may object to one or more of such items, or any part or

parts, portion or portions thereof, while approving of the other portion of the bill."

**43.** The District Court of Guam, in a 1965 memorandum decision holding that the Governor could not veto a portion of a bill providing for

Plaintiffs concede that the decision in *Blanch* constitutes a holding contrary to the position they urge on precisely the same language. They contend, however, that the court erred in finding that the power to reduce items of appropriation was clearly intended by the wording of the Act, and they contrast the ambiguous language of Section 1423i with the clear imperatives of the minority of states which do allow reduction. Furthermore, plaintiffs argue that the power to reduce is unresponsive to the purpose of the item veto power, the prevention of log-rolling, riders, and omnibus appropriations. The application of "part or parts . . ." to "bill" is particularly meaningful, they argue, in the absence of a "single purpose" limitation.[44]

Specifically, plaintiffs assert that the court in *Blanch* relied on semantic analysis to reach its conclusion. As noted above, however, this consideration was secondary to the Court's examination of legislative history. In addition, plaintiffs point to the fact that all seven of the states which expressly allow scaling down of items of appropriation provide for legislative override of the governor's reductions. As stated above, the most reasonable interpretation of Guam's Act permits such override. In this light, the allowance of reduction does not usurp the legislature's creative function; both veto *in toto* and reduction are subject to the override power.

State courts which have considered this issue have reached conflicting results. While plaintiffs note seven states which

specifically permit reduction as well as total veto of items of appropriation,[45] it is equally true that some jurisdictions clearly limit the executive's alternatives to either accepting or rejecting *in toto* an item of appropriation.[46]

Concededly, a number of state courts have held that the power of a governor to veto an item of appropriation or parts of such items does not include the power to change the amount of a single item. *See, e. g., Mills v. Porter (The Veto Case)*, 69 Mont. 325, 222 P. 428 (1924); *Stong v. People*, 74 Colo. 283, 220 P. 999 (1923); see generally 35 A.L.R. 606 *et seq.*; 99 A.L.R. 1277 *et seq.* By contrast, others have construed the state constitution to permit reduction of budget items. *See Commonwealth v. Barnett*, 199 Pa. 161, 48 A. 976 (1901).

In the present case, the clear holding in *Blanch v. Cordero, supra*, interpreting substantially identical language through consideration of both grammatical construction and legislative history, offers an eminently reasonable interpretation in the most directly analogous situation available. Perhaps Congress would have done well to follow the example of the states which articulate expressly whether or not they permit exercise of the item veto power in a partial fashion. In the absence of such definitive provision, however, the holding in *Blanch* is persuasive. Moreover, in light of this Court's determination that the override power is available to the Guamanian legislature, the finding of reduction power does

---

repeal of a section of the Government Code of Guam, referred to the decision in *Blanch v. Cordero*, 180 F.2d 856 (1st Cir. 1950), and apparently concluded that "the power of disapproval is limited to items or portions of items in an appropriation bill." *Bordallo v. Guerrero*, Civil 27–65, July 22, 1965.

**44.** A "single purpose" provision requires that each act concern only one subject. Plaintiffs suggest that the "part or parts" provision simply allows veto of a distinct item in a bill which may contain several items.

**45.** *E. g.*, Cal.Const. Art. 4, § 10(b): "The Governor may reduce or eliminate one or more items of appropriation while approving other portions of a bill. . . ."; Hawaii Const. Art. 3,

§ 17 "[The Governor] may veto any specific item or items in any bill which appropriates money for specific purposes by striking out or reducing the same; . . . ."

**46.** *E. g.*, in *Wheeler v. Gallet*, 43 Idaho 175, 249 P. 1067 (1926), the court noted that Article 4, Section 11 of the state constitution provides:

"The Governor shall have the power to disapprove of any item or items of any bill making appropriations of money embracing distinct items, and the part or parts approved shall become a law and the item or items disapproved shall be void unless enacted in the manner following."

no violence to the concept of separation of powers embodied in the Act of Guam.

Accordingly, the Court holds that the Governor acted within his power in reducing items in the budget for fiscal year 1977.

## VI.

The appropriations for the offices of Governor and Lieutenant Governor were among those vetoed to zero by the Governor. In plaintiffs' view the power to veto separately appropriations for these offices is inconsistent with the creation of these offices pursuant to the mandate of the Act itself. Without appropriations for his office, it is contended, the Governor is unable to assume responsibility, as directed by the Act, "for the faithful execution of the laws of Guam and the laws of the United States applicable in Guam." 48 U.S.C. § 1422. Moreover the very act of vetoing these appropriations, it is urged, is incompatible with the faithful execution of the laws of Guam.

In *State ex rel. Brotherton v. Blankenship*, 207 S.E.2d 421 (1973), the Supreme Court of Appeals of West Virginia construed the state constitution as prohibiting the governor from exercising item veto powers to reduce the budget for a constitutionally-created office to $0. In *Blankenship*, the governor struck appropriations for the offices of State Treasurer and Secretary of State, leaving only the salaries for these offices. The court reasoned that the framers of the state constitution in creating these offices intended that they function in the constitutional scheme. To reduce the budgets for these positions to $0, the court felt, would have the effect of eliminating the offices and exalting the governor to a position of omnipotence. 207 S.E.2d at 432–33.

The result in *Blankenship*, however, was not based upon the analysis of any authorities. Indeed, it smacks of outdated substantive due process notions which have served to rationalize courts' elimination of governmental action which they deemed unreasonable.

The decision in *Fitzsimmons v. Leon*, 141 F.2d 886 (1st Cir. 1944), insofar as the court addressed the question of reduction of a government official's salary set by antecedent legislation,[47] is not inconsistent with the Court's decision in the present case. The court in *Fitzsimmons* found that while the governor could scale down items in appropriations bills, his veto powers were not broad enough to enable him to reduce an amount fixed by statute when a specific constitutional provision prohibited reduction of any public officer's salary after his election or appointment. 141 F.2d at 888. Guam's Act contains no such provision. Instead, it provides simply that

". . . [t]he salaries and travel allowances of the Governor, Lieutenant Governor, the heads of the executive departments, other officers and employees of the government of Guam, and the members of the legislature, shall be paid by the government of Guam at rates prescribed by the laws of Guam." 48 U.S.C. § 1421d.

The power of the governor to exercise the item veto power to strike appropriations for particular offices or employment has been affirmed by a substantial body of decisions. *See, e. g.,* 35 A.L.R. 600 at 604–05. In fact, in *Millner v. Russel*, 311 Ill. 96, 142 N.E. 537 (1924), the governor was held to have the power to veto items appropriating salaries for assistant attorneys general although these positions had been created and the attendant salaries fixed with dates of payment under a prior statute.

Furthermore, in authorizing the item veto, Congress expressly provided that the power could be applied to *"any* bill" presented to the Governor containing "several items of appropriations of money. . . ." or to *"any* part or parts, portion or portions thereof. . . ." 48 U.S.C.

---

47. As to this Court's agreement with the dictum in *Fitzsimmons v. Leon*, 141 F.2d 886 (1st Cir. 1944), concerning the governor ability generally to *reduce* items of appropriation, see text, *supra.*

§ 1423i (emphasis added). To find the budget vetoes inconsistent with the more general provisions of the Act while ignoring the specific provisions of the precise section involved would necessitate the invocation of a most dubious constructional rationale.

■ Nor is plaintiffs' contention that the veto of the appropriations renders the offices in question a nullity necessarily sound. The Legislature may, of course, secure the majority necessary to override the veto. Should this alternative fail, the Legislature is not precluded from promptly reconsidering appropriations and resubmitting a proposal to the Governor. It is within the Legislature's power to pass appropriations with retroactive effect. In the interim, emergency payments could be provided.[48]

## VII.

■ In addition to vetoing monetary sums appropriated the Governor struck words, phrases, and conditions[49] of the proposed legislation. The item veto power cannot be exercised in this way. The powers granted to the Governor under the Act are powers to veto specific items of appropriations, not to eliminate or alter items of general legislation. The decisions emphasizing that words, phrases, and conditions are not items of appropriations are legion. *See, e. g., Bengzon v. Secretary of Justice, supra,* 299 U.S. 410, 57 S.Ct. 252, 81 L.Ed. 312 (1937); *In re Opinion of the Justices,* 294 Mass. 616, 2 N.E.2d 789 (1936); *Cald-*

*well v. Meskill,* 164 Conn. 299, 320 A.2d 788 (1973); *Opinion of the Justices,* 306 A.2d 720 (Del.1973); *State ex rel. Sego v. Kirkpatrick,* 86 N.M. 359, 524 P.2d 975 (1974).

Defendants argue that the Governor is free to strike words and phrases if they are integral "part or parts, portion or portions" of an item of appropriation, since Congress has stated in the Act that the Governor may veto *any* such parts or portions. The plethora of cases to the contrary should suffice to quell this assertion. Typical is the United States Supreme Court's decision in *Bengzon v. Secretary of Justice, supra,* in which it was explained that

" . . . [a]n item of an appropriation bill obviously means an item which in itself is a specific appropriation of money, not some general provision of law which happens to be put into an appropriation bill." 299 U.S. at 414–15, 57 S.Ct. at 254.

As indicated by the court in *State v. Holder, supra,* if the governor had the power to delete words and phrases, he could, in the extreme, approve the amount of the proposed appropriation while defeating its very purpose and the very conditions upon which the appropriation was intended to turn, unless the legislature could muster its override power. 23 So. at 645. Such selective deletion would provide the governor with an impermissibly creative legislative role.

Accordingly, this Court holds that the Governor's veto of words, phrases, and conditions had no effect on the budget provisions for fiscal year 1977.

---

**48.** By way of analogy, it might be noted that the Organic Acts of Hawaii (48 U.S.C. § 587, now omitted) and of Puerto Rico (48 U.S.C. § 826, now repealed) provided in their sections on failure to "pass" appropriations, that the governor and treasurer could make payments necessary to the functioning of the government until the legislature acted, the amounts of such payments depending on the assumption that the sums appropriated in the last bills would be in effect. Since this Court has ruled that exercise of the item veto does not indicate failure to "pass" appropriations, these provisions are useful principally as demonstrations of appropriate types of emergency measures.

**49.** As plaintiffs note, Governor Bordallo separately vetoed Section 2, Part Six (Public Law 13–148):

"In the event Bill 791 becomes law, the appropriation made therein for salary increments of the employees of the Territorial Crime Commission shall be deemed to be combined with the appropriation made by Section 1, Part One, of this Act, and shall be allocated to 'personnel services'. In the event, however, that Bill 791 does not become law, the appropriation made by Section 1 of this Act is hereby increased by one thousand two hundred twenty-three dollars ($1,223.00), said sum shall likewise however be allocated to 'personnel services'."

**418**

In view of this Court's holding that the Governor's failure to submit his vetoes to the Legislature within the ten days after its presentation to him resulted in enactment of the budget as drafted by the Legislature, it is unnecessary to consider what measures might be available in the absence of a budget.[50]

### ORDER

IT IS HEREBY ORDERED AND ADJUDGED:

1) The Governor is enjoined from applying the item veto power to invoke the Fiscal Year 1976 appropriations for the use of government agencies in Fiscal Year 1977;

2) The Governor may reduce the amount of specific items of appropriation even though he does not veto such items *in toto* ;

3) The Governor may veto to $0 appropriations for the offices of Governor and Lieutenant Governor;

4) The Governor may not veto words, phrases, or conditions contained in or accompanying items of appropriation;

5) The Legislature may override by a vote of two-thirds of all the members of the Legislature the item vetoes of the Governor.

Plaintiffs will submit a judgment in form approved by defendants by February 28, 1977.

---

**50.** It might be noted, however, that the discussion of the situation following a reduction of executive department budgets to $0 would appear equally applicable in other contexts in which necessary appropriations were unavailable.