

**Decided November 12, 1980**

IN THE DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

DOMINGO Q. ATALIG and ) CIVIL ACTION NO. 80-0011
LEON I. TAISACAN, )
)
      Plaintiffs, )
)
    vs. ) MEMORANDUM DECISION AND ORDER
)
CARLOS S. CAMACHO, in his )
official capacity *as Governor* )
of the Commonwealth of the )
Northern Mariana Islands, )
)
      Defendant. )
_____ )

## MEMORANDUM DECISION AND ORDER

Plaintiffs, citizens and residents of the island of Rota within the Commonwealth of the Northern Mariana Islands, brought this suit for declaratory relief, challenging the authority by which the Governor of the Northern Mariana Islands exercised his item veto power to an appropriation by the Commonwealth House of Representatives for capital improvement projects for Rota. Plaintiffs contend that the Governor exceeded his executive function by vetoing in toto the amount appropriated. Without arguing that the exercise of item veto is not within the constitutionally prescribed parameters of the executive power, plaintiffs submit that in this case such exercise of the veto power contravenes the supreme law of the Northern Marianas, particularly Article VII, Section 702(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, which provides:

> Section 702. Approval of this Covenant by the United States will constitute a commitment and pledge of the full faith and credit of the United States for the payment, as well as an authorization for the appropriation, of the following guaranteed annual levels of direct grant assistance to the Government of the Northern Mariana Islands for each of the seven fiscal years following the effective date of this Section:

94

(b) $4 million for capital improvement projects of which $500,000 each year will be reserved for such projects... on the Island of Rota....

Plaintiffs also contend that the governor may not veto local legislation providing for the local appropriation and allocation of the funds guaranteed to Rota by the United States.

On this cause plaintiffs moved on August 8, 1980 for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendant filed a cross-motion for summary judgment on September 2, 1980. The Court finds that it has jurisdiction of this action under 48 U.S.C. § 1694a(a); 28 U.S.C.A. § 2201 as amended Oct. 4, 1976, Pub. L. 94-455, Title XIII, § 1306(b)(8), 90 Stat. 1719; Nov. 6, 1978, Pub. L. 95-598, Title II, § 249, 92 Stat. 2672; Art. IX, Sec. 903 of the Covenant, supra. For the reasons set forth below, the Court caused to be filed on September 12, 1980 an order granting defendant's motion for summary judgment, and will cause to be filed hereinafter its order denying plaintiffs' motion.

I.

It is clear that a motion for summary judgment for equitable relief may be properly brought in this Court. 48 U.S.C. § 1694a(a); Rule 56(a), F.R.C.P.; 10 Wright and Miller, Federal Practice and Procedure, § 2711 at 365-366 (1973) citing, inter alia, Daily Press, Inc. v. United Press Int'l, 412 F.2d 126 (6th Cir. 1969), cert. denied 90 S.Ct. 480, 396 U.S. 990, 24 L. Ed.2d 453, Bland v. Norfolk & So. R.R. Co., 406 F.2d 863 (4th Cir. 1969), Booth v. Barber Transp. Co., 256 F.2d 927 (8th Cir. 1958). Under Rule 56, all the facts and all reasonable inferences to be drawn from these facts must be viewed in the light most favorable to the party against whom the motion is made. Summary judgment may be granted only when no material questions of fact remain. Rule 56(c), F.R.C.P., Santos v. Scindia Steam Navigation Co., 598 F.2d 480,

483, (9th Cir. 1979), citing <u>Poller v. Columbia Broadcasting Systems,</u> <u>Inc.</u>, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L. Ed.2d 458 (1962); <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L. Ed.2d 176 (1962); <u>United States v. Perry</u>, 431 F.2d 1020, 1022 (9th Cir. 1970); <u>Radobenko v. Automated Equipment Corporation</u>, 520 F.2d 540, 543, (9th Cir. 1975); <u>United States v. Bissett-Berman</u> <u>Corporation</u>, 481 F.2d 764, 767 (9th Cir. 1973).

II.

On April 2, 1980, the Governor of the Commonwealth of the Northern Mariana Islands received House Bill No. 2-88 (the Budget Bill) for consideration pursuant to Sections 7(a) and (b) of the Constitution of the Northern Mariana Islands. Sections (a) and (b) provide that:

> a) Every bill enacted shall be signed by the presiding officer of the house in which the bill originated and transmitted to the governor. If the governor signs the bill, it shall become law. If the governor vetoes the bill, it shall be returned to the presiding officer of each house of the legislature with a statement of the reasons for the veto. <u>The governor may veto an item or section in an appropriation bill and sign the remainder of the bill.</u> (emphasis added)
>
> b) The governor shall have twenty days in which to consider appropriation bills and forty days in which to consider other bills. If the governor fails either to sign or veto a bill within the applicable period, it shall become law.

Title II, Sec. 7, Item B of H.B. No. 2-88, which provided for an appropriation of $1,545,000.00 listed as CAPITAL IMPROVEMENTS FOR ROTA, was vetoed and disapproved by the Governor for the following stated reasons:

> 1. Rota has been approriated an amount which is excessive when the population of Rota is compared to the total population of the Commonwealth; and

2. Rota has been appropriated an amount which creates disproportionate inequities to the people of Tinian and Saipan; and

3. Rota has been appropriated an amount which created an unjustifiable inequity to the people of Tinian. The Covenant treats Rota and Tinian in a substantially equal manner in regard to the capital improvement funds for the two senatorial districts, yet this appropriation treats Rota in a highly favorable manner, giving Rota in excess of $500,000 more than Tinian. There is no justification for such a distinct inequity between the two islands--the appropriation gives Rota 18.3% of the total Commonwealth CIP funds and Tinian receives only 11.9% of the total CIP funds. This creates a significant inequity in terms of dollars and capital improvements in favor of Rota and to the distinct disadvantage of Tinian; and

4. Inasmuch as the Chairman of the Rota Delegation has voiced serious concerns about the continuing union of Rota and the Commonwealth, and has raised the issue of possible secession from the Commonwealth, it would be inappropriate to invest large sums of money at this time in long term capital improvements until the desires of the people of Rota are determined in respect to continued union with the Commonwealth.

(Certainly Rota is entitled to its Capital Improvement Projects share as earmarked in the Covenant, however, there is no justification for Rota to receive more than its share. Tinian should receive an amount relatively equal to what Rota receives for CIP.)

The Court finds that the item veto exercised by the Governor and the reasons he set forth therefor in his memorandum of action are clearly within his executive power.

Counsel for both parties agree that the amount guaranteed by the United States under Section 702(b) of the Covenant, including the composite price index adjustment required by Sec. 704(c), would approximate $790,000.00. The $1,545,000.00 appropriated exceeds this amount. But even if the governor chose to set this excess as the sole reason for vetoing this particular item, Section 7(a) of the Constitution, in any event, does not authorize the Governor to reduce, without eliminating, items of appropriation. The

Constitution does provide for the veto of an item or section in an appropriation bill. These alternatives from which the Governor may choose in acting upon legislation, clearly set out in the Constitution, are further amplified in the Analysis to the Constitution of the NMI, Sec. 7(a) at pp. 54-55:

> The Governor who receives the bill may sign it, veto it, or take no action. If the governor signs the bill, it becomes law. If the governor vetoes the bill, it is returned to the legislature and does not become law unless the veto is overridden by a subsequent vote. If the governor takes no action, neither signing nor vetoing the bill, it becomes law.
>
> If the governor vetoes the bill, he must so indicate on the face of the bill and return it to the presiding officer of each house of the legislature. The governor must transmit with the bill a statement of reasons for the veto. There is no limitation on or requirement with respect to the reason or reasons that will be sufficient. This matter is left entirely to the discretion of the governor.
>
> When the governor receives an appropriation bill, there is a fourth alternative available. The governor may veto any item or group of items in the bill and sign the remainder. By so doing, the signed portions become law and vetoed portions do not become law. If the governor vetoes any item in a appropriation bill, the portion of the bill containing the vetoed item must be returned to the presiding officer of each house of the legislature with a statement of reasons. The legislature may override the vetoed portions of an appropriation bill in the same manner as it may override the veto of an entire bill. The term "item" as it is used in this section means a single amount appropriation for any purpose. There is no limit on the number of items that the governor may veto in a single appropriation bill.

(emphases added)

According to the above analysis, if the Governor is dissatisfied with an amount appropriated by the Legislature, he may take

98

one of two possible courses of action to express his disapproval. He may either veto the bill in its entirety, or he may veto any item or groups of items in the bill and sign the remainder. There is no provision in the Constitution authorizing him to reduce an appropriation that he believes to be excessive to an amount which comports with his idea of a fair and sensible appropriation.

## III.

The item veto, as limited to items of appropriations, is generally available to the executives of the several states and territories of the United States; there is, however, considerable variation among provisions as to the precise limits of the power. See Thirteenth Guam Legislature v. Bordallo, 430 F. Supp. 405, 410 (D.C. Guam 1977); affirmed 588 F.2d 265 (9th Cir. 1978). In Bordallo, it was held, inter alia, that the Governor of Guam was authorized to reduce as well as veto in toto the items in an appropriation bill. This authority was found in the language of 48 U.S.C. § 1423i, which provided in pertinent part:

> ". . . If any bill presented to the Governor contains several items of appropriation of money, he may object to one or more of such items, or any part or parts, portion or portions thereof, while approving the other items, parts, or portions of the bill."

The court in Bordallo cited Blanch v. Cordero, 180 F.2d 856 (1st Cir. 1950) in support of its holding that the phrase "part or parts, portion or portions thereof" authorized such reduction. In construing language almost identical to § 1423i, Blanch held that Section 34 of the Organic Act of Puerto Rico provided the governor with power to reduce as well as strike items in an appropriations bill. The opinion in Blanch relied primarily on

the legislative history of the Section, observing that as originally introduced, the bill gave the governor the power to object only to "one or more of such items," but that it was amended on the Senate floor to add the words "or any part or parts, portion or portions thereof." Thirteenth Guam Legislature v. Bordallo, supra at 414. The conclusion reached by the court in Blanch was that there was "no doubt" that the Organic Act as amended granted the governor the power to scale down as well as veto in toto any item in the bill. Id., citing Blanch v. Cordero, supra at 858.

The court in Bordallo recognized that a number of state courts have held that the power of a governor to veto an item of appropriations or parts of such items does not include the power to change the amounts of a single item, id. at 415, citing Mills v. Porter (The Veto Case), 69 Mont. 325, 222 P. 428 (1924); Strong v. People, 74 Colo. 283, 220 P. 999 (1923); see generally 35 A.L.R. 606 et seq.; 99 A.L.R. 1277 et seq.; while others have construed the state constitution to permit reduction of budget items [citing Commonwealth v. Barnett, 199 Pa. 161, 48 A. 976 (1901)]. In the instant case, the language of the Constitution is clear, and no authority is granted to the governor of the Northern Mariana Islands which would permit him to reduce the amounts for specific items appropriated by the Legislature. However, if any doubt remains, those provisions of the Analysis cited supra spell out the limitation on executive action regarding legislation.

IV.

The exercise of executive veto does not, of course, signal the death knell to legislative appropriations. Those bills or items thereof that have been vetoed must be timely returned to the presiding officers of each house of the legislature with a statement of the reasons for the veto, otherwise such bills or items become law.

Even if timely returned, any bill or item may still become law if two-thirds of the members of each house vote upon reconsideration to override the governor's veto. Constitution, Article II, Section 7(c).

V.

On July 29, 1980, the Governor disapproved Senate Local Bill 2-1, which purported to appropriate the amount of $790,000.00 for Rota capital improvements. The plaintiffs contend that the Governor should not be allowed to veto local legislation providing for a local appropriation and allocation of the funds appropriated by the United States specifically for Rota. In support of this contention, plaintiffs cite Article II, Section 6 of the Constitution which provides:

> Section 6: Local Laws. Laws that relate exclusively to local matters within one senatorial district may be enacted by the legislature or by the affirmative vote of a majority of the members representing that district. The legislature shall define the local matters from the respective senatorial districts, laws enacted through initiative by the voters of a senatorial district under article IX, Section 1, regulations promulgated by a mayor under article VI, section 3(e), or local ordinances adopted by agencies of local government established under article VI, section 6(b).

Plaintiffs submit that the allocation of funds specifically designated for capital improvement projects on Rota "relate exclusively to local matters within one senatorial district," the island of Rota being the First Senatorial District.

In his letter of disapproval of Senate Local Bill No. 2-1, addressed to the Honorable Pedro P. Tenorio, President of the Senate, the Governor gave the following reasons for returning the Bill without his approval:

101

The Covenant funds were not collected from a local Rota tax and therefore it is not a bill subject to local legislation by the Rota Senatorial District Delegation.

The scope of this legislation has an impact on the people, finances and development of the entire Commonwealth.

The Constitution is clear in Section 5 of Article II that appropriation bills may only be introduced in the House of Representatives. Since this is a Senate local bill it violates this provision.

The governor's understanding of appropriation bills vis-a-vis local bills is supported by the Constitution and the Analysis to the Constitution. Article II, Section 5(a) of the Constitution provides:

Section 5:  Enactment of Legislation.
a)  Appropriation and revenue bills may be introduced in the house of representatives.  Other bills may be introduced in either house of the legislature.

The Analysis of Article II, Section 6 of the Constitution provides in relevant part:

Section 6:  Local Laws.  A local law is a law that relates exclusively to local matter within one senatorial district.

\*                    \*                    \*

This section gives the legislature the authority to define local matters. The Convention concluded that any effort to provide a specific definition in the Constitution might restrict the ability of the Commonwealth to deal flexibly with local matters and might engender uncertainty or needless litigation.  It is intended that matters such as curfews and hunting seasons would be considered local matters; as well as many of the subjects or areas over which the municipal councils exercised authority under the chartered municipality form of local government.  It is recognized, however, that some activities which take place on

102

a single island have an impact through-
out the Commonwealth and therefore cannot
be considered "local matters", such as
legalized gambling. The location of
an activity, therefore, does not control
whether it is to be considered a local
matter; other considerations, such as
the impact on the people, finances,
laws, development or policies of the
entire Commonwealth must also be evaluated.

\* \* \*

The requirement that a local law deal
exclusively with local matters operates
independently of the definition of local
matters. For example, curfews may be a
local matter but a single law that imposed
a curfew on both Rota and Tinian would not
relate exclusively to the local matters of
one senatorial district and therefore would
not be local law under this section.

Article VII, Section 702 of the Covenant provides a commit-
ment and pledge on the part of the United States for the payment,
as well as an authorization for the appropriation, of a guaranteed
annual level of direct grant assistance to the Government of the
Northern Mariana Islands, including capital improvement projects
on Rota. Section 702(b) provides for a total of $4 million for
capital improvement projects throughout the Commonwealth. Of the
$4 million, $500,000 [with annual adjustment provided in section
704(c)] is reserved for Tinian, and the same amount is reserved
for Rota.

However, while these funds are earmarked for Rota, the Court
finds, nevertheless, that "the United States will provide direct
multi-year financial support to the government of the Northern Mariana
Islands for local government operations, for capital improvement
programs, and for economic development. (emphasis added) Sec. 702,
Constitution. These funds belong to the government of the Northern
Marianas -- and as such, must be appropriated by legislative action
as provided by the Constitution. There is also no requirement that
they be appropriated for Rota's use each fiscal year. To the con-
trary. Section 704(a) provides that: "Funds provided under Section

103

702 not obligated or expended <u>by the government of the Northern Mariana Islands</u> during any fiscal year, will remain available for obligation or expenditure by <u>that government</u> in subsequent fiscal years for the purposes for which they were appropriated (by the United States)."  (emphases added)

Because of the governor's veto, the government of the Northern Marianas has not obligated or expended the Rota funds, but remain available for obligation or expenditure by the government of the Mariana Islands in future fiscal years.

Clearly, these are Government of the Northern Marianas funds -- not "local" Rota funds which may be appropriated by Senate action alone -- a procedure which is not provided for by the Constitution or any law of the Northern Mariana Islands.  This being so, any appropriation for capital improvement projects on Rota is properly within the sphere of Article II, Section 5(a) of the Constitution, in that it is or would be exactly what it purports to be, that is, an appropriation bill.  As such, it may only be introduced in the House of Representatives.

The recourse is both academic and obvious.  The legislature could, if it chooses, override the veto.  The House of Representatives may submit or reintroduce an appropriations bill for the same amount of money as that provided in Senate Bill No. 2-1, and if the Governor persists in his veto, both houses may secure the necessary majority to override his veto.

The exercise of discretion in this area of executive power is not reviewable by the judiciary since the governor's actions  as permitted by the Constitution, are political in the generic sense. The actions of the Legislative Branch, as the same may also be permitted by the Constitution, would also fall within that same category.  Whether either branch of government has acted responsibly or irresponsibly, can only be answered by the people through the election process.  This is the peoples' response to political accounting.

Accordingly, it is hereby ORDERED that plaintiffs' motion be and is HEREBY DENIED.  Defendant's Motion for Summary Judgment has been earlier granted and Ordered.

DATED:  Saipan, Northern Mariana Islands this _____ day of NOVEMBER, 1980.